## JOHNSON et al. v. MONTGOMERY et al.
## No. 3412.

Court of Civil Appeals of Texas. Amarillo.
June 18, 1930.

Rehearing Denied Sept. 10, 1930.

J. B. Dudley, of Oklahoma City, Okl., Alger Melton, of Chickasha, Okl., J. B. Dooley, of Amarillo, E. A. Coker, of Dallas, J. Sid O'Keefe, of Panhandle, and Phillips, Trammell, Chizum, Price & Estes, of Fort Worth, for appellants.

R. E. Underwood, Otis Trulove, William Boyce, Cooper & Lumpkin and Morgan, Morgan & Britain, all of Amarillo, and Bullington, Boone, Humphrey & King, of Wichita Falls, for appellees.

RANDOLPH, J.

The parties will be designated as in the trial court.

This suit was instituted by appellants as plaintiffs in the district court of Hutchinson county, Tex., against appellees as defendants. The venue of the case was thereafter changed from that court to the district court of Carson county, Tex. On trial of the case in the

last-named court, the court instructed the jury to return a verdict for the defendants, which the jury accordingly did. On this verdict so returned, the trial court rendered judgment in favor of the defendants, and from that judgment the plaintiffs have appealed to this court.

We appropriate the statement of the case in part from plaintiffs' brief and in part from defendants' brief.

On May 29, 1919, E. B. Johnson and Ben F. Johnson, as lessors, executed to George E. Montgomery an oil and gas lease on 22,485 acres of land in Hutchinson county, Tex. The lease was a five-year lease in what is known as the Producers 88 Form, providing for one-eighth of the oil produced and saved, $200 per year in advance ror each gas well where gas only was found, and $50 per year for gas from any oil well produced and used off of the premises, and a down payment of $22,485. If no well was commenced on or before May 29, 1924, the lease was to terminate as to both parties unless the lessee deposited in the First National Bank of Chickasha, Okl., rental in the sum of $22,485, which deferred the commencement of a well for twelve months from such date. The lease provided that "in like manner and upon like payment or tender, the commencement of a well may be further deferred for a like period of the same number of months successively." Further that "should the first well drilled on the above described land be a dry hole, then and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties unless the Lessee, on or before the expiration of such twelve months, shall assume the payment of rentals in the same amount and in the same manner as hereinbefore provided."

At the same time and as part of the same transaction, the parties lessors and lessees entered into a written additional contract, which was duly recorded as a part of the lease, and which contract is in the following words and figures:

"This contract ,and agreement made and entered into on this the 29th day of May, 1919, by and between E. B. Johnson, of Norman, Oklahoma, and Ben F. Johnson, of Chickasha, Oklahoma, parties of the first part, and George E. Montgomery, party of the second part;

"Witnesseth: That whereas the parties of the first part are the owners of 22,485, Twenty-Two Thousand, four hundred and eighty-five acres of land situated in Hutchinson County, Texas, known as the Johnson Brothers ranch, on which said land they have this day executed and delivered to the party of the second part a commercial oil and gas lease, which said lease is here referred to and made a part hereof as though set out in full herein;

"Now, therefore, it is hereby mutually agreed between the parties hereto as follows:

"First—The commencement of a test well on any portion of said acreage and the completion thereof as expeditiously as possible shall have the effect of paying the rental upon the section upon which said test well is commenced and completed, together with three additional sections adjacent thereto, for the remainder of the term of said lease. In this connection, however, it is agreed that said test well shall be drilled to a depth of at least three thousand feet unless oil or gas is found in paying quantities at a lesser depth, and upon the commencement of said test well the party of the second part shall notify the parties of the first part, in writing, of the commencement thereof and the adjacent sections which he desires to be freed from the rental provided for in said lease, and in order to entitle him to the delayed rental thereof he must diligently and in good faith prosecute the drilling of said well to said depth; provided, however, that he may, if he so elects, drill said test well to a greater depth than three thousand feet, if he sees fit, and upon the failure to diligently and expeditiously prosecute and complete said test well he shall forfeit his right to the delayed rentals thereon. In the event said test well proves to be a dry hole it is agreed that the drilling thereof shall have the effect of delaying the rentals upon said sections.

"Second—It is further agreed by the parties hereto that said second party may drill as many test wells as he sees fit upon the acreage covered in said oil and gas lease, and that the terms and conditions with reference to drilling the test well referred to in Paragraph One hereof shall apply with equal force to any other test wells which he may drill thereon.

"Third—It is further agreed between the parties hereto that the commencement and drilling of said test well or wells shall in no event affect or delay the rentals provided for in said oil and gas lease as to the remainder of the acreage not covered or included by said test well or wells.

"Fourth—This contract and agreement shall be considered and regarded by the parties hereto as part of said oil and gas lease.

"Fifth—The land referred to herein and included in said oil and gas lease is as follows: (Description of land not necessary here.)

"Sixth—It is further expressly agreed between the parties hereto that the party of the second part may sell, transfer or assign his interest in and to the said acreage covered by said oil and gas lease, or any part thereof, and that the terms and conditions of this

contract shall apply with the same force and effect as though no sale, transfer or assignment had been made; in other words, the purchaser or assignee of said acreage, or any part thereof, shall take 'the same subject to the terms and conditions of this contract.

"In witness whereof, the parties have hereto, subscribed their names the day and year first above written."

At the time of the execution of the lease, E. B. Johnson and Ben F. Johnson owned the land described in the lease. Shortly after its execution, on June 2, 1919, Ben F. Johnson conveyed his interest in the property to Neil R. Johnson, Montford T. Johnson, and Graham B. Johnson, and the other plaintiffs in the suit claim through conveyances from E. B. Johnson and the grantees of Ben F. Johnson aforesaid. The defendants all claim as assignees of George E. Montgomery, holding by assignments the original lease in so far as the same covered separate tracts of land described in the petition.

The primary term of the lease was, as stated, five years, terminating May 29, 1924. No oil was produced during this term, and the only development thereon is shown by the following paragraph of a stipulation entered into between the parties, viz.:

"That a well was begun to be drilled on section No. 37 described in plaintiffs petition on May 19th, 1923, and that such well shortly prior to May 29th, 1924, produced gas in paying quantities. That a well was begun on Section 4, Block Y–2, described in plaintiffs' petition, on May 26th, 1923, and shortly prior to May 29th, 1924, produced gas in paying quantities. That about the time of the beginning of the drilling of said well on section 37, above described, George E. Montgomery, and his assignees, designated the three sections of land adjacent to the section on which said well was drilled, being the three sections of land described in plaintiff's petition, sections 36 and 40 in Block Y, and section 74 in block 46; that about the time said well was begun on Section No. 4, block Y–2, George E. Montgomery and his assigns designated sections 1, 2 and 3, block Y–2, such designation being pursuant to the original oil and gas lease and written contract executed in connection therewith, and that said wells were drilled by assignees under George E. Montgomery of said oil and gas lease. That each and both of said wells on May 29th, 1924, were producing gas in paying quantities, or were capable of producing gas in paying quantities, and that they so continued to produce gas or to be capable of producing gas, up and until after the filing of this suit. Such two wells were the only wells drilled during the five year term of the lease, and are the only wells relied on by the defendants as extending the lease beyond May 29th, 1924."

This suit was brought June 3, 1924, by E. B. Johnson and the other plaintiffs owners of the lands and mineral interest in the lands embraced in the suit, against George E. Montgomery and the assignees of the lease on all acreage except that embraced in the two four-section blocks designated in the contract, which was executed simultaneously with the lease, to have the lease adjudged to be canceled and terminated, and to recover title and possession of the property. After considerable acreage had been eliminated by settlements, the case was tried on October 21, 1929, and resulted in a judgment in favor of the defendants remaining in the suit as above stated.

The plaintiffs' cause of action was not an action for cancellation, but was an action to declare that the lease on the lands involved had terminated and expired by its own limitations and to recover the title and possession of the property described in their petition.

The suit involved all of the lands described in the original lease except 37 in block Y, a section upon which a producing gas well had been drilled prior to the expiration of the primary term of said lease, and sections 36 and 40 in block Y, and section No. 74 in block 46; these four sections having been excepted from the suit. Sections Nos. 1, 2, 3, and 4 in block Y–2 were also excepted from said suit for the reason that it was alleged and admitted that a producing gas well had been drilled on section No. 4 prior to the expiration of the fixed term of said lease. The suit, therefore, involved all of the lands described in plaintiffs' petition except the two blocks of four sections each named above and such other lands as were included in settlements with the other defendants in the original litigation. The plaintiffs pleaded ambiguity in the contract executed and made a part of the original contract.

The plaintiffs contend that in this state a lease contract, such as the one in this case, vests in the lessee a determinable fee in seven-eighths of the minerals; that the vital consideration for the execution thereof is the development of the property, and if oil or gas be encountered, the expected royalties on the mineral production; that rentals are not a consideration for the estate granted, but are money paid for the privilege of delaying drilling; and that applying these principles, the Johnsons granted a determinable fee in seven-eighths of the minerals, for which estate the Johnsons covenanted, not for the defendants to pay rentals, but to drill for oil and gas and to pay royalties if such were discovered.

The plaintiffs further contend that under the lease without the contract, the 22,485 acres were an entirety and the consideration to be paid was also an entirety and indivisible; hence, the commencement of one

well would have been the beginning of the payment of the consideration for the entire acreage and that one producing well would have continued the whole lease beyond its primary term. But they say such an extension does not occur in this case for the reason that while under the lease the drilling of one well "freed" the entire acreage from the payment of delay rentals, under the contract executed at the time and as a part of the lease, such result is accomplished only as to the sections on which the wells are drilled and three other adjacent sections which have to be designated by the lessees. That this demonstrates that the consideration and also the lease was divisible and that the lease, outside of the two four-section blocks, was terminated and plaintiffs were entitled to a peremptory instruction.

The defendants' counter propositions in reply to plaintiffs' contentions are, in part:

(a) The lease in question granted to the lessees a determinable fee in the minerals upon the whole tract of 22,485 acres for a fixed term of five years, and *as long thereafter* as oil or gas or either of them was produced from said land; that is, it is provided that said lease *shall* remain in force for a term of five years from the date thereof, and as long thereafter as oil or gas or either of them is produced from said lands by the lessees. That this estate was a determinable fee and was not limited by the additional provision in the accompanying contract which declared that the beginning and completion of a well during the primary term of the lease should have the effect of payment of rentals upon the section upon which such well was drilled and three additional sections; that this clause in the contract only affected the obligation or duty of the lessee to pay rentals for the privilege of deferring the beginning of a well and was not a limitation defining the duration of the grant.

(b) If the provision above stated was ambiguous, such ambiguity alone condemned it as a limitation upon the estate granted; words of limitation debasing a fee must be clearly stated and be of certain definite ascertainment; and that any ambiguity therein renders the limitation void.

(c) That the clause in the contract dealing with rentals alone merely provided an equivalent method of liquidating rentals as to a certain portion of the land and did not limit the expressed provision that the lease should remain in force for a term of five years from said date and as long thereafter as oil or gas or either of them was produced from the land by the lessee.

(d) The lease and contract construed together was an entire and indivisible contract to be construed together as to the whole of the 22,485-acre tract, and that there was no covenant to develop each four-section block separately from the other lands, and the les-

sees were entitled to have and to hold the entire tract; that is, the 22,485 acres upon payment of the rentals as to the residue of the land outside of the two four-section blocks as long as oil or gas was produced therefrom.

It is agreed between the parties that due and timely payments have been made of all rentals under the lease contract for the years beginning on the 29th of May, 1920, 1921, 1922, and 1923, except rentals for the year 1923 on the eight sections mentioned in plaintiffs' petition as being exempt. Further that if rentals under said contract were payable for the year May 29, 1924 (the effect and necessity of such payments and the right of the depository to receive or accept such payments for any period subsequent to May 29, 1924, being matters which remain at issue despite this stipulation), payment thereof to the depository bank was made as to certain of the lands covered by the lease by tender duly made by defendants.

The parties further agreed as follows:

"The parties stipulate that at the time the oil and gas lease and contemporaneous contract in question were executed on May 29, 1919, that the nearest well producing gas to the land covered by said lease was located in Potter County, Texas, about 30 miles from said leased land and was a gas well with a daily capacity of from ten to fifteen million cubic feet; that at said time there were two other wells being drilled in search of oil or gas in said Potter County; that the nearest locality having producing oil wells at that time was the Electra field in Wichita County, Texas; that at said time various of the major oil companies held leases upon lands located in Hutchinson County, Texas, in the general vicinity of the land in question; that at said time geologists representing some one or more of said major oil companies were geologizing lands in Hutchinson County, Texas, in the vicinity of the lands in question for oil and gas; that at said time it was a matter of general public knowledge that development in search of oil and gas would probably take place in said Hutchinson County; that the parties to the lease and contract in question were aware of the facts above stated; that subsequent to the date of said lease and contract and during the five year term thereof and prior to May 29, 1924, both oil and gas were secured in paying quantities to the south, east and north of the land covered by the lease in question and within a distance of a few miles thereof."

It appears from the recitals in the lease and contract and from the agreements between the parties that the 22,485 acres of land covered by the lease were situated, at the time of the execution of the lease, in purely wildcat territory; that no oil was being produced nearer than Electra; that the nearest well producing gas was located about

thirty miles from the lands herein in controversy, in Potter county, Tex.; that such well was producing daily about 15,000,000 cubic feet of gas; that several of the major oil companies were geologizing lands for oil and gas in Hutchinson county in the general vicinity of the lands in question; that the original or down payment of $22,485 was made at the time of the execution of the lease and contract.

■ The lease vested in Montgomery a determinable fee, and unless the contract executed with it at the same time limited the estate vested in the defendants by such lease, there should be no forfeiture by implication.

■■ The lease was for a period of five years and terminated May 29, 1924, if no development had occurred and all rentals had been paid.. The defendants assert that the bringing in of the two gas wells was such a compliance with the contract as to keep the lease alive as long as gas and oil were produced from the land. In the first place, we hold that the lease and the contract are not ambiguous; that. the contract executed at the time of the execution of the lease only related to and controlled the rentals and did not affect the estate vested in the defendants by the lease. This being true, the question of innocent purchaser for value and without notice becomes immaterial.

■ The cash consideration of $22,485 paid at the time and under the conditions surrounding the execution of the lease and contract was a substantial consideration for the lease conveyed, situated in wildcat territory. The failure of the defendants to continue with the development work after the 29th of May, 1924, is excused by the plaintiffs filing this suit. Under these conditions and circumstances, the plaintiffs were not in a position to demand diligence in the further development of the property for oil or gas by the continued drilling of the well. Consumers' Gas Trust Co. v. Worth, 163 Ind. 141, 71 N. E. 489; Weaver Mining Co. v. Guthrie, 189 Mo. App. 108, 175 S. W. 118; Leonard v. Busch-Everett Co., 139 La. 1099, 72 So. 749; McCallister v. Texas Co. (Tex. Civ. App.) 223 S. W. 859, 861 (Writ refused); Edgar et al. v. Bost et ux. (Tex. Civ. App.) 14 S.W.(2d) 364.

■ If the estate conveyed to the defendants by the lease was a determinable fee and they having drilled the two wells producing gas in commercial quantities, within the primary period, the right to forfeit the lease for the breach of an implied obligation to continue the development after the producing of the two gas wells did not exist. Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464.

■ As stated above, this is not a suit to cancel the lease and contract, but is a suit to declare the contract terminated, which in effect is a suit to cancel the lease. In other words, a judgment declaring the lease terminated naturally operates to cancel all rights held by the defendants. Hence the rule that a lease cannot be canceled because of an implied obligation to continue to prosecute development. This is the rule unless the record discloses an abandonment on the part of the lessees. Grubb v. McAfee, supra.

In the case at bar, it is shown that the defendants continued during the five-year primary period to produce gas from each of the two wells shown to have been drilled, and that as to such production there was no abandonment of the leased premises.

■ The lease having vested in Montgomery and his assigns the additional contract set out above subject to their covenant for further development, the breach of such covenant does not. authorize the forfeiture or cancellation of the lease. We do not mean to hold that this released the defendants from damages for a failure to continue reasonable development of the whole tract, but that in the form in which this suit was brought, the plaintiffs are not entitled to judgment terminating the lease, because there was no abandonment of the lease, only a cessation of present and future developments of the acreage outside of the two four-section blocks.

■ The down payment of $22,485 and the provision for the drilling of the well was a sufficient consideration for the vesting of the estate in the defendants.

■ It appears to us that the lessees desired the continuance of the rental payments upon the residue of the land and the contract executed with the lease was required only on the theory that it release the payment of rents only upon the two four-section blocks, but enabled the lessors to continue the collection of the rentals on the residue for the full period of the five years. This did not operate to divest the defendants of the estate vested in them by the lease, but only applied to an extension of rentals beyond the requirements contained in the lease. The primary period having expired and the defendants having brought in two producing wells—the rentals having been paid for the full period of the primary term and no longer being due—the title was vested in the defendants by the lease and contract. The provision in the contract segregating the eight sections applies only to the rentals and was not intended by its language to limit the estate—rather, it was to provide another term for the payment of rentals.

Sustaining our view herein, we think it only necessary to cite and consider the opinion of the Supreme Court in the case of Waggoner Estate v. Sigler Oil & Gas Co.; 19 S. W.(2d) 27, as we think that case is decisive upon the question here at issue.

Associate Justice Greenwood, speaking for the Supreme Court, lays down the following rules as having been settled by the decisions in this state:

First. Such a writing as that here called a lease operated to invest the party called lessee and his assigns with the title to oil and gas in place.

Second. The estate acquired by the so-called lessee and his assignees was a determinable fee, which was lost on cessation of the use of the land for the purpose of oil and gas exploration, development, and production.

Third. The estate of the lessee or of his assigns did not survive abandonment.

Fourth. Where a mining lease provided for oil or gas royalties and failed to define the lessees' duty as regards development after discovery of paying oil or gas, the law implied the obligation from the lessees to continue the development and production of oil or gas with reasonable diligence.

Fifth. Breach of lessees' implied obligation for reasonable mineral operations will not authorize the forfeiture of the lease as for breach of condition subsequent, such obligation being a covenant.

Sixth. The usual remedy for breach of the lessees' implied covenant for reasonable development of oil and gas is an action for damage, though, under extraordinary circumstances, where there can be no other adequate relief, a court of equity will entertain an action to cancel the lease in whole or in part.

The opinion further holds that notwithstanding the stipulation that each producing well brought in under the lease on the 85,000 acres there involved should hold 2,000 acres in a square without payment of future rentals upon a residue of 1,000 acres, still the Sigler Oil Company, as the assignee of the original lessee, was under an implied obligation, after the drilling of the two paying wells, to continue with reasonable diligence, during the five-year term as well as thereafter, the work of exploring for and production of oil and gas in the 3,000 acres.

Upon the question as to whether the implied obligation for further reasonable development, while the 3,000 acres was producing oil from two wells, was a "limitation" as meaning a phrase or a number of phrases in a conveyance which delimit the duration of an interest in land, the opinion says:

"The only clauses in the writing before us which could delimit the duration of the interests granted are as follows: First, the clause providing for the termination of the lease as to both parties, unless a well was commenced on the land, on or before June 1, 1919; second, the clause demising and leasing the land for the sole and only purpose of mining and operating for and producing oil and gas, and saving them for market; third, the clause stipulating that the lease should remain in force for a term of five years from date, on payment of annual rentals, and as much longer as oil or gas was produced from, the land by the lessee or his assigns."

The language used in the contract executed with the lease does not make the duration of the granted estate depend on the degree of diligence used in the continued exploration, development, and production of oil and gas, as gas was being actually produced from the leased land.

"A court should never override by implication the intention of the parties expressed in a binding writing." Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.(2d) 1039, 1043, 60 A. L. R. 890.

"The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear, whose unequivocal character may render its exercise fair and rightful." Decker v. Kirlicks, 110 Tex. 94, 216 S. W. 385, 386.

Having held that there was no ambiguity in the language of the contract, it necessarily follows that the trial court did not err in sustaining the defendants' objection to the testimony offered by the plaintiffs to explain their intentions in executing the contract.

We therefore affirm the judgment of the trial court.

JACKSON, J., not sitting.