**KIDD et al. v. HICKEY et al.**

**No. 4744.**

Court of Civil Appeals of Texas. El Paso.

Oct. 11, 1950.

Rehearing Denied Nov. 29, 1950.

John N. Jackson, George Parker, Jr., and Coke & Coke, all of Dallas, Henry Russell, Pecos, for appellants.

Whitaker, Turpin, Kerr, Smith & Brooks, Midland, Downey & Parr, Odessa, for appellees.

Bascom Giles, State Land Commissioner, Austin, by leave of Court appeared amicus curiæ.

McGILL, Justice:

This is an appeal from a judgment of the District Court of Reeves County, 109th Judicial District.

The controversy involves the construction of an oil and gas lease under the Relinquishment Act, Vernon's Ann.Civ.St., art. 5367 et seq., on a square section of land containing 640 acres in Reeves County.

Appellants by an action in the statutory form of trespass to try title sought to recover from appellees title to an oil and gas leasehold estate in the SW4 of Section 10, Block 56, Township 2, T. & P. Ry. Co. Survey in Reeves County. Section 10, containing 640 acres classified as mineral land, was originally leased for oil and gas by Jack C. Tunstill, the surface owner, individually and as agent for the State of Texas, to Texzona Production Company on November 7, 1946. An assignment of this lease on the SW4 of Section 10 was acquired by appellants on April 1, 1948. Appellees' claim to title is grounded on a lease of the SW4 of Section 10 from the surface owners individually and as agents for the State, dated December 8, 1948.

The basic question for decision is whether the leasehold estate in the SW4 created by the original lease of Section 10 dated November 7, 1946, had terminated when appellees acquired their lease by reason of the lessees' failure to drill or to pay delay rentals on the SW4. The facts are mostly covered by stipulation of the parties, and are undisputed. A photostatic copy of the original lease of November 7, 1946, appears in the Statement of Facts. We here reproduce the pertinent portions thereof. This lease is on form No. 5367, General Land Office lease form under Relinquishment Act. The portions herein italicized are inserted by typewriter:

### "Oil and Gas Lease.

"This Agreement, made and entered into this *7th.* day of *November* 1946, by and between *Jack C. Tunstill, a single man, individually and as agent for the State of Texas.* of *Fort Worth, Texas.* (Give permanent address) individually and as agent for the State of Texas, party of the first part, herein referred to as Lessor (whether one or more) and *Texzona Production Company, 703 Ins. Bldg.* of *Fort Worth, Texas* (Give permanent address) party of the second part, hereinafter called Lessee.

"Witnesseth: That the Lessor in the capacities aforesaid, for and in consideration of *$320.00* Dollars, cash in hand paid, as his individual property and estate, receipt of which is hereby acknowledged, (SEE NOTE BELOW) and a like amount paid to the State of Texas, and of the covenants and agreements hereinafter contained on the part of the Lessee to be paid, kept and performed *do* this day granted, demised, leased and let, and by these presents do grant; demise, lease and let unto the said Lessee, for the sole and only purpose of prospecting and drilling for and producing oil and gas, laying pipe lines, building tanks, storing oil and building power stations, telephone lines and other structures thereon, to produce, save, take care, treat and transport said products of the lease the following land situated in *Reeves* County, State of Texas, to-wit:

*"All of Section 10, Block 56, Township 2, T. & P. Ry. Company Survey. And as a further consideration the lessee herein agrees to commence the actual drilling of a test well on the above described tract of land on or before 90 days from the date of this instrument, to a depth of 4000 feet, or unless oil and gas, or either of them is found in paying quantities at a lesser depth; It is further agreed that one well producing in paying quantities (oil or gas) will eliminate the delay rental requirement prescribed herein covering the 160 acres on which said well is located, 'except the ten cents per acre minimum rental provided in Paragraph 8 hereof.'*
containing *640* acres, more or less.

"Subject to the other provisions herein contained, this lease shall remain in force for a term of *5* years from this date, (herein called primary term) and as long thereafter as oil and gas, or either of them, is produced in paying quantities from the land hereby leased.

"In consideration of the premises the said Lessee covenants and agrees:

"1. To pay to the Commissioner of the General Land Office of the State of Texas, at Austin, Texas, free of cost in the pipe line with which the well or wells may be connected, *1/16* of the value of all oil and gas produced and saved from said leased premises as required by Article 5368 of the General Laws of the State of Texas, 1925, Revised.

"2. To deliver to the credit of the Lessor as the owner of the soil, free of cost, in the tanks or pipe lines to which wells may be connected an additional equal *1/16* part of all oil and gas produced and saved from said leased premises or at the option of Lessor *1/16* of the value of all oil and gas produced and saved from said leased premises.

"3. If no well be commenced on said land, hereby leased, on or before the *7th.* day of *November* 1947, this lease shall terminate as to both parties, unless the Lessee on or before that date shall pay or tender to the Lessor as the owner of the soil or to his credit in the *Continental Nat'l*

Bank, at *Fort Worth, Texas,* on that portion *not held by production,* or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of *$320.00 (50c per acre)* Dollars, and in addition shall pay to the Commissioner of the General Land Office of the State of Texas, at Austin, Texas, a Like Sum on or before said date, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date. In like manner and upon the payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively.

"8. However, it is understood and agreed that notwithstanding the fact that development may be in progress or production secured and royalty being paid hereunder the owner or operator of the leased premises shall continue to make annual rental payments to the State which, under such conditions and in the absence of any rentals being paid to the land owner, shall be the minimum of ten cents (10c) per acre as provided by said Article 5368.

"16. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer or assignment or true copy thereof; and it is hereby agreed in the event this lease shall be assigned as to a part or as to parts of the above described lands and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rentals due from him or them, such default shall not operate to defeat or affect this lease in so far as it covers the part or parts of said lands upon which the said Lessee or any assignee thereof shall make due payment of said rentals."

The above provision of the lease for the drilling of a test well within 90 days from its date was duly complied with. This well was drilled on the NW4 of Section 10. On November 7, 1947, oil was being produced in paying quantities from this well drilled under the terms of the lease, and since November 7, 1947, oil has been produced in paying quantities from a well or wells drilled on Section 10 under the terms of the lease, and at the time of the trial was so being produced. The provisions of paragraph 8 of the lease were duly complied with for the period from the date of the lease to November 7, 1948. Neither appellants nor their predecessor in interest commenced the drilling of an oil and/or gas well on the SW4 of Section 10 on or before November 7, 1947, nor prior to December 2, 1948, when the Commissioner of the General Land Office noted on his records that the lease as to the SW4 of Section 10 had terminated for failure to drill or pay delay rentals. No delay rentals of 50c per acre were tendered or paid to the owner of the soil or to the Commissioner of the General Land Office on or before November 7, 1947, or December 2, 1948. The trial court held that appellants had no valid claim to an oil and gas leasehold estate on the SW4 of Section 10, and that they take nothing by their suit.

It is appellants' contention that since production was obtained and continuously maintained from other portions of the land covered by the lease of November 7, 1946, and since such lease contains no express provision for termination in the event of failure to pay delay rentals on the SW4, they acquired title to the oil and gas leasehold estate on the SW4 of Section 10 which has continued in full force and effect. Appellees counter that by the express terms of the lease of November 7, 1946, such lease automatically terminated as to the SW4 on the lessees' failure to commence a well on the SW4 on or before November 7, 1947, or to pay delay rentals on the SW4 on or before such date. They repeatedly assert in their brief that the lease expressly required either the drilling of a well on

each ¼ section (160 acres) or the payment of delay rentals on each ¼ section on or before November 7, 1947. In other words, they contend that the lease of November 7, 1946, by its express terms categorically divided Section 10 into four separate 160 acre leases, each covering a ¼ of Section 10 designated as the NW4, NE4, SE4 and the SW4 of Section 10 for the purpose of development and payment of delay rentals and that the special limitations contained in paragraph 3 of the lease applied to the SW4 and that the lease terminated on the SW4 by such limitations.

It is at once apparent from a mere reading of the lease of November 7, 1946, that it contains no such express provision as asserted by appellees. The question then arises whether such provision should be written into the original lease by necessary implication and the special limitations of paragraph 3 applied to the SW4 of Section 10. It is no longer an open question in this State that an oil and gas lease of the character here in question vests in the lessee and its assigns a determinable fee in ⅞ of the oil and gas in place under the surface covered by the lease. Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290; 31-A Tex.Jur. Oil and Gas, Sections 117, 118, 119.

It is also well settled that provisions such as contained in paragraph 3 of the original lease constitute special limitations on the determinable fee conveyed, and that on the lessee's failure to comply with these provisions the leasehold estate is automatically terminated. 8 Tex.Law Review, p. 520(3) and authorities there cited; article by A. W. Walker, Jr.

Such special limitations should not be implied from vague or doubtful language. Johnson v. Gurley, 52 Tex. 222; McCallister v. Texas Co., Tex.Civ.App., 223 S.W. 859, (Wr. Ref.); Dale v. Simon, Tex.Civ. App., 248 S.W. 703, affirmed, Tex.Com. App., 267 S.W. 467.

The lease of November 7, 1926, contains only two express provisions relative to its termination; (1) That subject to other provisions therein contained it should remain in force for a term of five years from its date (the primary term) and as long thereafter as oil and gas or either of them "is produced in paying quantities from the land hereby leased", and (2) Paragraph 3 above quoted. Certainly the language relative to the primary term expressly refers to the entire 640 acres contained in Section 10. This was "the land hereby leased"; also we think the language of paragraph 3 "If no well be commenced on said land hereby leased" following as it does the provision creating the primary term, expressly refers to Section 10 in its entirety. These express provisions mitigate against any provision express or implied which would divide the land into four separate leases for the purpose of development and payment of delay rentals. They are entirely inconsistent with and repugnant to any such provision which would invoke the special limitations of paragraph 3 as to each separate lease. The typewritten insertions above quoted are exceedingly vague and indefinite. To illustrate—let us suppose that only one well were drilled on Section 10, and that this well were located in the center of the square section on the common corners of the NW4, SW4, NE4 and the SE4. Under appellees' theory on which quarter section of 160 acres of Section 10 would the lease of November 7, 1946, be kept alive by the drilling of such well? Again looking at paragraph 3: If a well producing oil and gas in paying quantities were drilled on any portion of Section 10 by the express terms of the previously typewritten insertion, it is expressly agreed that the delay rentals on 160 acres on which the well should be located should be eliminated, yet paragraph 3 requires the payment of $320.00, that is, 50c per acre, on the entire 640 acres "on that portion not held by production." Obviously the required payment of $320.00 would not be at the rate of 50c per acre if there were any production on any part of Section 10 which would eliminate the payment of delay rentals on 160 acres. The only logical deduction is that the provisions of paragraph 3 relative to the pay-

ment of delay rentals are applicable only if there were no production on any part of Section 10, which we think is the express provision of the first portion of paragraph 3. It is quite clear that the lease as written is ambiguous. Under the rules of construction above indicated we are not warranted in ascribing a meaning to it which would invoke the special limitations of paragraph 3 as to the SW4. Such construction would conflict with the express provision of the clause creating the primary term, and we think also with the express provisions of paragraph 3. It is our holding that under these express provisions the drilling of a producing well prior to November 7, 1947, and the production of oil in paying quantities continuously since that time from portions of Section 10 other than the SW4 kept the lease alive and in full force and effect on the SW4 without the payment of any delay rentals. We regard the cases of McCallister v. Texas Co., and Dale v. Simon, supra, as very persuasive.

We recognize the rule that the lease being ambiguous parol evidence is admissible to explain its seeming ambiguity and to show the true intention of the parties to it. Producers Oil Co. v. Snyder, Tex.Civ. App., 190 S.W. 514. However, the interpretation of the lease by the Commissioner of the General Land Office as evidenced by his notation of its termination on his records is no evidence of its true meaning. This is clearly shown by the testimony of Klavenan; nor is the fact that the land owners who executed a lease to Hickey on December 8, 1948, and a lease to Crouch on January 11, 1950, used language in such leases which is similar to the language employed in the lease of November 7, 1946, any evidence of the intention of the parties as to the meaning of the lease of November 7, 1946. In the two leases referred to all lessors except Jack C. Tunstill were different, and the lessee in each of these leases was different than the parties to the lease of November 7, 1946, and their intention can have no bearing on the intention of the parties to the lease of November 7, 1946.

Our holding necessitates consideration of appellant's second point to effect that since

appellee Louis Crouch had actual knowledge of appellant's claim of title to the leasehold estate on the SW4 of Section 10, and acted without advice of counsel as to the validity of appellant's claim, he was not in good faith in entering on this land and drilling a well thereon, and is entitled to no relief on account of the expenditures so made. The evidence is uncontroverted that Boyd appellees' representative, in an administrative capacity had actual knowledge of appellants' assignment of the leasehold interest in the SW4 and of their claim of title thereunder prior to December 8, 1948, when appellees acquired their lease of the SW4 from the land owners individually and as agents for the State. Boyd's testimony reveals that drilling was commenced on the SW4 on December 27th, 1948, casing was set on January 23, 1949, and the well was completed on March 21, 1949. Appellants filed their suit on January 17, 1949, and filed notice of lis pendens on January 25, 1949.

We think this point is settled by Houston Production Co. v. Mecom Oil Co., Tex. Com.App., 62 S.W.2d 75. Appellees' contention that the good faith of a lessee under a Relinquishment Act lease cannot be questioned by the courts since the lessee has the unquestioned right to rely on the title of the sovereign is not controlling. The jury finding in the Mecom case was that the lessee at the time it drilled the well and undertook to develop the land honestly and in good faith believed that it had a lease on the land and had a right to develop it. Here, as there, at the time drilling was commenced appellee Crouch knew or was charged with knowledge of appellants' claim and at least some portion of the work was done by him after appellants filed suit to enforce their rights and filed notice of lis pendens. Under the holding in Houston Production Co. v. Mecom Oil Co., supra, and the authorities there cited under such circumstances the expenditures made by Crouch in drilling the well were made at his peril and he can recover no part thereof.

In their original answer appellees set up a plea in abatement on the ground that the

State of Texas or the Commissioner of the General Land Office and Jack C. Tunstill, the surface owner who executed the original lease individually and as agent for the State, and who with others so executed the lease of December 8, 1948, under which appellees claim, were necessary and indispensable parties to the suit. The court overruled this plea and such action is brought forward by an alternative cross-assignment of error. We think there was no error in the court's action in overruling the plea in abatement. This is not a suit to cancel the lease of December 8, 1948, which could be maintained only by the State. Colquitt v. Gulf Production Co., Tex.Com.App., 52 S.W.2d 235. It is a suit in trespass to try title by which appellants seek to recover title to and possession of the leasehold estate which they claim by assignment of the lease of November 7, 1946, insofar as it covers the SW4 of Section 10. Since we have held that this lease had not terminated, appellants are entitled to recover. It is not necessary to adjudicate the rights of the State in the lease of December 8, 1948, and such rights are not res adjudicata by the judgment rendered herein. The fact that the same questions are involved as would necessarily be involved in a suit brought by the State or appellees to determine the validity of the lease of December 8, 1948, does not require that the State or the Commissioner of the General Land Office or the surface owners be parties to this suit.

It is ordered that the judgment of the trial court be reversed, and it appearing that the facts have been fully developed, judgment is here rendered that appellants (plaintiffs) do have and recover of and from appellees (defendants) judgment for title to and possession of the oil and gas leasehold estate in the SW4 of Section 10, Block 56, Township 2, T. & P. Ry. Co. Survey in Reeves County, Texas, as prayed for, and costs of suit, and that appellee Louis Crouch recover nothing as reimbursement for expenditures made in drilling a well on such property.

Reversed and rendered.

## On Motion for Rehearing

SUTTON, Justice.

This is an appeal from the District Court of Reeves County. The suit is in trespass to try title. Barron Kidd and A. W. Cherry brought the suit to recover the oil and gas leasehold estate covering the Southwest quarter of Section 10, Block 56, Township 2, T. & P. Ry. Co., Reeves County, Texas. The trial was to the court and judgment that the plaintiffs take nothing, from which this appeal is prosecuted. On the original consideration we reversed and rendered the case but on the motion for a rehearing a majority of the Court have concluded the former disposition is erroneous and that the motion should be granted and our former judgment set aside.

The lands involved are classified as mineral and were sold with the usual mineral reservation. Plaintiffs claim the oil and gas lease on the southwest quarter of Section 10 by virtue of an assignment under an original lease covering the whole section. The original lease was executed by Jack C. Tunstill, the surface owner, as agent of the State, on a General Land Office printed form numbered 5367. It is in usual form with blanks left for the insertion of the names and addresses of the parties, dates, the bonus payment, rentals, royalties and description of the lands. In the blank space provided in the lease form for the description of the land the following is inserted with typewriter, following the recitation there is leased "the following land situated in Reeves County, State of Texas, to wit:" "All of Section 10, Block 56, Township 2, T. & P. Ry. Survey. And as a further consideration the lessee herein agrees to commence the actual drilling of a test well on the above described tract of land on or before 90 days from the date of this instrument, to a depth of 4000 feet, or unless oil and gas, or either of them is found in paying quantities at a lesser depth. It is further agreed that one well producing in paying quantities (oil or gas) will eliminate the delay rental requirements prescribed herein covering the 160 acres on which said well is located, except the ten

cents per acre minimum rental provided in paragraph 8 hereof."

The rental provided in paragraph 8 is that prescribed in Art. 5368, Vernon's Ann. Civ.St.

Printed paragraph 3 of the lease, with the insertion of dates, name of depository, the amount of annual rentals and one interlineation specially noted hereafter, reads as follows: "If no well be commenced on said land, hereby leased, on or before November 7th, 1947, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the Lessor as the owner of the soil or to his credit in the Continental Nat'l Bank at Ft. Worth, Texas, *on that portion not held by production,* or its successors, which shall continue as the depository regardless of change in the ownership of said land, the sum of $320.00 (50¢ per acre) Dollars and in addition shall pay to the Commissioner of the General Land Office of the State of Texas, at Austin, Texas, a Like Sum on or before said date, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date. In like manner and upon the payment or tenders the commencement of a well may be further deferred for like periods of the same number of months successively."

The provision, "on that portion not held by production", italicized by us above was interlined with typewriter in printed paragraph 3. The original lease was dated November 7, 1946, and was for a primary term of five years, "and as long thereafter as oil and gas, or either of them, is produced in paying quantities from the land hereby leased."

The facts are mostly stipulated and are not in dispute. A test well was commenced on the NW4 of Section 10 within the 90 days provided in the quoted provision above. The well produced and the section has produced since the date the well was completed until the date of the trial of the case. The minimum rental of ten cents per acre due the State under the statute and as provided in paragraph 8 of the lease

was timely paid on the SW4 of Section 10. No annual rentals provided in paragraph 3 were paid either to the surface or the State; nor a well commenced on the SW4 prior to December 2, 1948, on which date the Commissioner of the General Land Office noted on his records the lease on the SW4 had terminated for failure to commence a well thereon or to pay the rentals due thereon. The SW4 was leased December 8, 1948, by the surface owner as agent of the State to the defendant, David H. Hickey, under which lease he and the other defendants, Louis Crouch and Texzona Production Company, claim title to said SW4.

The basic and controlling question is, Did the original lease of November 7, 1946, terminate by virtue of its terms under the facts of the case? We think it did. By a specially inserted provision following the description of the land, copied hereinbefore, it is specifically provided one producing well will suspend the rental payments on the 160 acres on which the well is located except the minimum rental due the State under the statute. Likewise the provision interlined in paragraph 3 specifically exempts from the payment of rentals any 160 acres upon which production is had. The two specially inserted provisions when read and construed together, as they must be, make clear, we think, the intention of the parties to provide for the drilling of an additional well or wells, in the event production is had, on the remaining 160 acre tracts, or pay the rentals thereon at the rate of 50¢ per acre to the surface owner and a like sum to the State or suffer the termination of the lease on such portions. In short, the intention of the parties, clear to this writer, was in case of production to provide for the testing of the remaining portions, or for the payment of the rentals or termination of the lease as to such portions. The purpose was, if production was had, to provide for the testing and development of the remaining portions.

The commencement of the well on the NW4 obviated the payment of rentals for the first rental period on any part of the section. The production on that quarter

suspended the payment of rentals thereon and continued the life of the lease thereon so long as oil and gas, or either of them were produced in paying quantities. The specially inserted provisions provided for the commencement of another well on some portion of the remaining acreage during the second rental period or the payment of the 50¢ rentals or the termination of the lease thereon. Neither of these provisions were met so far as the SW4 is concerned and the original lease thereon, in our opinion, terminated November 7, 1948, and the lease to Hickey dated December 8, 1948, was valid.

The rentals are provided for in the first instance in paragraph 3 if no well be commenced. The contract provides, in paragraph 7, if the first well drilled be a dry hole then a second well shall be commenced within 12 months from the expiration of the last rental period or the lease shall terminate as to both parties unless the Lessee shall within such period resume the payment of rentals due under the contract. But, in case the first well produces, as it did in the instant case, the specially inserted provision provides for that contingency and specifically provides the production shall suspend the payment of rentals on the 160 acres upon which the well is located and the lease continues so long as production is continued on that unit. There is no conflict, it is thought, between any of such provisions, nor is there any conflict in the specially inserted provisions and those fixing the primary term of the lease at five years or so long as oil and gas or either of them is produced, because that provision recites it is "subject to the other provisions herein contained."

It cannot be said the inserted provisions were idly inserted without a purpose. On the other hand they each take care of a definite contingency and clearly provide what shall be the effect. If there were a conflict between the written and the printed provisions the printed provisions would have to yield to the written provisions. Armstrong v. National Life Ins. Co., Tex. Civ.App., 112 S.W. 327 (e. r.); Constitution Indemnity Co. v. Armbrust, Tex.Civ.App.,

25 S.W.2d 176 (e. r); Producer's Oil Co. v. Snyder, Tex.Civ.App., 190 S.W. 514. Again, another elementary rule of construction is the contract will be construed as a whole and effect given to all its provisions if it can lawfully and reasonably be done. Jackson v. Watts, Tex.Civ.App., 113 S.W.2d 584 (e. r.); Wisdom v. Wilson, 59 Tex.Civ.App. 593, 127 S.W. 1128 (e. r), and to which might be added a long list of authorities. Giving effect to all the provisions of this lease it simply means the intention of the parties was in case a well produced it should perpetuate the lease on 160 acres only and the Lessee should resume drilling operations or pay rentals at the rate of 50¢ per acre to the surface owner and a like sum to the State within the rental period on the remaining portions not thus held by production, or that the lease should terminate on such remaining portions.

We conclude, therefore, the judgment of the trial court is correct and it is affirmed.

PRICE, Chief Justice (concurring).

The parties to the lease in question might lawfully provide that the section be developed as a unit or they might provide that the land be divided into 160 acre tracts for the purpose of development. It seems to me that from the provisions of the lease the only proper construction is that same was divided into quarter-sections for the purpose of development; also that the conditional limitation as to drilling or paying delay rentals by the contracting parties applied to each quarter section. See Summers Oil & Gas, Perm.Ed. Vol. 3, p. 205, latter part of Sec. 515; Producers Oil Co. v. Snyder, Tex.Civ.App., 190 S.W. 514; Johnson v. Montgomery, Tex.Civ.App., 31 S.W.2d 160, Wr. Ref.; Hunt Production Company v. Dickerson, Tex.Civ.App., 135 S.W.2d 597; Jackson v. Kent, 106 W.Va. 37, 145 S.E. 572.

One hundred and sixty acres is a quarter-section. The only sanction the State had to enforce the drilling on each quarter-section was the conditional limitation.

The only rentals provided for in the lease in question are delayed rentals. State

v. Magnolia Petroleum Co., Tex.Civ.App., 173 S.W.2d 186.

Under the express provisions of the lease, development of oil in paying quantities renders the payment of delay rentals unnecessary to keep the lease in force as to the 160 acres or quarter-section on which such production is developed. This lease for a certainty intends to provide that the development of oil in paying quantities on 160 acres shall keep the lease in good standing as to such 160 acres only. For a certainty it is intended that rental be paid for the privilege of delaying development on the other 480 acres constituting the section leased. Delay rentals are not paid for the use of minerals, the purpose of payment is for the option to develop and make use of the minerals at a later date. The lessee is in no way bound to pay delay rentals. Their payment during the primary term does excuse development and keep alive the right to develop.

McGILL, Justice (dissenting).

I realize that the proper construction of the lease of November 7, 1946 is not free from doubt. However, with due respect to the able brief filed by the Land Commissioner and the views of my associates I adhere to the views expressed in our original opinion and adopt that opinion as my dissent. I desire to add that there can be no question but that the parties could by appropriate language lawfully provide that Section 10, the section leased, consisting of 640 acres, should be divided into one-quarter section tracts for the purpose of development and payment of delay rentals. This is beside the point. The question is whether they did do so under the lease of November 7, 1946. It may be conceded that the instrument evidences an intention that the drilling of one well on Section 10 should exempt 160 acres from payment of delay rentals and that payment of delay rentals on the remaining 480 acres of Section 10 was nevertheless required. Yet there is nothing in the instrument which indicates on which particular portion of Section 10 any well should be drilled or to which the exemption should apply. It is true that we judicially know that there are 160 acres of land in one quarter-section of land, but it does not follow that the 160 acres on which a well is drilled shall comprise any particular one-quarter section. This is demonstrated in our original opinion where the question is posed as to which particular quarter-section would be exempt should the well have been drilled in the center of Sectoin 10 where the 160 acres on which it were drilled could lie in one one-quarter section as well as another. At most the language is vague and indefinite as to just which portion of Section 10 shall be exempt from payment of delay rentals by the drilling of a well thereon. The language of Chief Justice Phillips in Decker v. Kirlicks, 110 Tex. 90, 91, loc. cit. 94, 216 S.W. 385, 386, which applied to a forfeiture, should in my opinion be equally applicable to a conditional limitation. "If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear, whose unequivocal character may render its exercise fair and rightful."

It is far better that the vague and indefinite language employed be held to be a futility than that it have the effect of limiting appellants' estate conveyed to them by the lease.

For these reasons and the reasons stated in our original opinion I respectfully dissent.