**SKELLY OIL COMPANY et al.,**
Appellants,

v.

Gertrude L. ARCHER et al., Appellees.

No. 6942.

Court of Civil Appeals of Texas.

Amarillo.

April 4, 1960.

Rehearing Denied May 2, 1960.

Underwood, Wilson, Sutton, Heare & Berry, Amarillo, C. L. Swim, Tulsa, for appellants.

Sanders, Scott, Saunders, Brian & Humphrey, Amarillo, for appellees.

NORTHCUTT, Justice.

This case was before us once before as shown at 314 S.W.2d 655 and a writ of error was refused NRE by the Supreme Court 317 S.W.2d 47, as follows:

"PER CURIAM.

"The opinion of the Court of Civil Appeals is reported in 314 S.W.2d 655. The holding that the cost of construction of a pipe line for marketing the gas should be included in determining whether the well or wells in question were producing oil in paying quantities is not before us, and we express no opinion thereon. The application is refused, no reversible error."

We do not think it is necessary, in this case, for us to consider as to whether the cost of construction of a pipe line for marketing the gas should be included in determining whether the well or wells in question were producing gas in paying quantities. We will not consider that question in this opinion, since it is not involved herein.

Since we have heretofore in the previous opinion ruled upon the many matters here involved, and believe we were correct in our holdings as to our interpretation of the rider in question, we will make the same statements here.

"Gertrude L. Archer, a widow of Hansford County, Texas; Harriet Thomas Collard, a widow; Harriet Thomas Collard and R. L. McClellan, executrix and executor respectively of the estate of J. R. Collard, deceased, brought this suit against Skelly Oil Company in trespass to try title and alternatively sought termination of an oil and gas lease on 2¾ sections of land upon which the primary term had ended. The oil and gas lease entered into between Mrs. G. L. Archer and the Skelly Oil Company was on a regular Oil and Gas Producer's Eighty-eight Form, was dated August 5, 1943, provided for a primary term of 10 years but had the following rider or addition added to the lease before the grantor, Mrs. Gertrude L. Archer would sign it:

" 'In the event of gas production being obtained on the above 3,040 acre lease, not more than 640 acres shall be held by each well, and annual rentals shall be paid on the balance of the acreage. In the event that a gas well is drilled, the revenue from same shall be equal to, or exceed the amount of the annual rental payments, based on one well to each section. In no event shall the payments received by the lessor amount to less than $3,040.00 during any one 12-months period. This rider and provision shall be controlling over any conflicting provisions contained in the printed form attached hereto and made a part hereof.'

"The property described in the oil and gas lease was all of Sections 4, 282, 285 and 292 and the south one-half and northwest one-fourth of Section 284, totaling 3,040 acres. The parties named as plaintiffs other than Gertrude L. Archer acquired their interest by conveyance from Mrs. Archer after the original oil and gas lease was executed." [314 S.W.2d 658.]

The present case was tried according to the holdings expressed in the opinion at 314 S.W.2d 655. At the close of the evidence in this case the trial court held as follows:

" * * * as a matter of law and also by uncontroverted facts as shown by the evidence and the testimony and the Court now finds and holds that the oil and gas lease in question dated August 5, 1943, has terminated as to Section 4, Block 'P', H&GN RR Co. Survey; all of Section 282, Block 2, GH& H RR Co. Survey; and the South Half (S/2) and the Northwest Quarter (NW/4) of Section 284, Block 2, GH&H RR Co. Survey, all in Hansford County, Texas, same having terminated at the expiration of the primary term

of said lease, to-wit: August 5, 1953. And further, that said oil and gas lease which is recorded in Volume 9, page 286, Lease and Contract Records of Hansford County, Texas, is a valid and subsisting lease covering Section 285, Block 2, GH&H RR Co. Survey, Hansford County, Texas, same being continued after the primary term of said lease down to the date of trial by virtue of production of gas in paying quantities from said Section 285;"

This left only Section 292 to be considered in the trial. The court then submitted one special issue to a jury. The issue asked if the gas well on Section 292 failed to produce gas in paying quantities for the period of August 5, 1953 to August 5, 1956. The jury answered in the affirmative. The primary term of the lease ended on August 5, 1953. This case was originally filed November 8, 1955 and the court limited the evidence as to whether the well was producing gas in paying quantities for the three years subsequent to the end of the primary term. The trial court entered judgment that appellees have title and possession of Sections 4, 282, 292, and the South Half (S/2) and the northwest Quarter (NW/4) of Section 284. The judgment further provided that appellees be denied all relief prayed for as to section 285 and held the lease as to 285 was to continue in full force and effect. From this judgment Skelly Oil Company perfected this appeal.

■ "In addition to the conditions included in the Oil and Gas Producers Eighty-eight Form the Parties were bound by the rider attached thereto. Though we are not saying this addition or rider to the lease is so plain as not to reflect a shadow of doubt as to its meaning, let us examine carefully the four sentences in an effort to arrive at the meaning thereof. The first sentence provides, "In the event of gas production being obtained on the above 3,040 acre lease, not more than 640 acres shall be held by each well, and annual rentals shall be payed

on the balance of the acreage." Under the record of this case this sentence to this writer means that production on one part of the total acreage did not relieve the lessee of paying delay rentals on the entire acreage but had the effect of isolating the sections on which there was production from the other land so far as delay rentals were concerned just as if the two 640 acre tracts comprised a separate lease. We believe the clause in the sentence which says, 'not more than 640 acres shall be held by each well,' intended and should be interpreted to mean that all the 3,040 acres outside of that on which there was production of gas to the extent of one well for each 640 acres would revert to the owners at the end of the primary term. * * *

■ "The second sentence of the rider says, 'In the event that a gas well is drilled, the revenue from same shall be equal to, or exceed the amount of the annual rental payments, based on one well to each section.' This sentence simply guarantees to the lessor that she would have as much net money in case of production of gas as she would have in the event the lessee made no effort to develop the lease or any part of it and that she would not be limited to the dollar an acre guarantee in the event her ⅛ of the gas paid more than $640 for each section on which there was production.

■ "The third sentence says, 'In no event shall the payments received by the lessor amount to less than $3,040 during any 12-months period,' seems to this writer to be a reiteration or an emphasis on the fact that the lessor during the primary term, whether production is had or not, would be entitled to as much as $3,040 for each 12-months period. The last of the four sentences in the rider simply makes the addition added to the lease controlling over any conflicting provision in the regular lease form.

■ "There is no question from the record of this case but that this rider is an ad-

dition to the lease made strictly for the benefit of the lessor and we know of no reason, logic or law precluding it if the lessee was willing to take it under those conditions. Gas production on Sections 285 and 292, within the meaning of the rider, obviated the payment of rentals on those two sections and continued the life of the lease thereon so long as the revenue to the lessor equaled or exceeded $640 to each section. This statement is not to say that the other part of the lease, construed in accordance with the interpretation by our Supreme Court in Garcia v. King, 139 Tex. 578, 164 S.W.2d 509 of the word 'produced' as used in the 'thereafter' clause of the lease, could not also terminate the lease at the end of the primary term on the two sections under production if production was not in paying quantities, * * *."

■ "Even though we should be wrong in our interpretation of the rider and even if said rider is not ambiguous the testimony of [Dan Archer] is admissible to prove the circumstances out of which that part of the instrument had its birth and which surrounded the adoption. Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007, at page 1010, syl. 1–2.

"In Scott v. Walden, Tex.Com.App., 165 S.W.2d 449, 452, it is said:

" 'Whether or not, strictly speaking, the language of the grant is ambiguous need not be discussed, for even though it is not ambiguous on its face parol evidence was nevertheless properly admitted to apply the language to the subject with which it dealt for the purpose of ascertaining the real intention of the parties.'

"Practically the same rule as that just quoted has been announced by our Supreme Court in Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579, 583, wherein that court said:

" 'It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties.'

"Our Supreme Court in Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566, 570 where the court had received evidence of subsequent interpretating actions of the parties in a suit involving forfeiting of an oil and gas lease said:

" 'If there is any doubt about the meaning of the various terms of the contracts before us, the Court may consider the interpretation placed upon them by the parties themselves. In this instance the acts of the parties indicated the construction mutually placed upon the contracts at the time, including the acts done in their performance, and same are entitled to great if not controlling weight. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence if the intention of the parties that whatever was done by them in the performance of the contract was done under the terms of the contract as they understood them * * *.'

■ "The oil and gas lease is nothing more than a contract between the parties. The meaning of the rider is certainly one of the most controversial questions. Even though we have placed our interpretation upon it it still could not be said that it is so plain as not to reflect a shadow of doubt as to its meaning. The fact that the parties themselves disagree so violently as to its meaning is some reason for saying that it is not so plain as not to reflect a shadow of doubt. In Ellisor v. Kennedy, 128 S.W.2d 842, 844 (writ refused) the Court of Civil Appeals at Galveston has said:

" 'The ultimate purpose of the courts should be to arrive at the real intention of the parties to a contract, and to give the contract force accordingly. It is an important rule of construction that a written contract, plain and reflecting no shadow of doubt as to its meaning, shall be the sole evidence of the intention of the contracting parties. But, if the contract is not clearly unambiguous, the rule should not be permitted to defeat an intention and understanding which can be clearly proven by parol, and to lead to a conclusion which is absurd.'

We consider the statement just quoted from the Court of Civil Appeals at Galveston just as authoritative as if it had been said .by the Supreme Court. When the Supreme Court refuses a writ of error outright (writ refused) it gives full approval to the opinion in that case and makes the opinion as authoritative as one of its own opinions. Biggers v. Continental Bus System, Inc., Tex., 303 S.W.2d 359, at page 364. * * *"

■ "We believe it is not any longer a debatable question in Texas but that the word 'produced' in the 'thereafter' clause of an oil and gas lease means 'produced in paying quantities.' In Garcia v. King, 139 Tex. 578, 164 S.W.2d 509, 511 our Supreme Court, speaking through the late Chief Justice Alexander, quoted with approval from an opinion of the Supreme Court of Oklahoma as follows:

" 'Some authority may be found holding that, if a lease is to continue so long as oil or gas is produced, it is immaterial whether the lease is a paying one or not, for so long as the well drilled produces either oil or gas the lease continues. Thornton's Law of Oil & Gas, § 150, citing Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N.E. 1043. The construction there given the term "produce" does not appeal to us, because the very purpose of the

landowner in executing the lease is to have the oil and gas on the leased premises produced and marketed so that he may receive his royalty therefrom, and the purpose of the lessee is to discover and produce oil and gas in such quantities as will yield him a profit.' Gypy Oil Co. v. Marsh, 121 Okl. 135, 249 P. 329, 48 A.L.R. 876.

The case just cited also is authority for the proposition that 'paying quantities' when used in this connection, means paying quantities to the lessee. Many cases, including some from our own court, have held likewise. In Persky v. First State Bank of Vernon, Tex.Civ.App., 117 S.W. 2d 861, this court speaking through Judge Folley quoted with approval from Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5, as follows (117 S.W.2d 863): ' "The words 'paying quantities' as applied to a gas lease mean that the gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well * * *"' This court then went on to hold in the Persky case that the cost of drilling the well could not be considered in determining whether or not production was not in paying quantities."

■ We think the record clearly shows the gas well on Section 285 was producing gas in paying quantities and affirm the judgment of the court as to that section. From what we have heretofore said, we think it is clear that since there were only two wells drilled during the primary term, one on Section 285 and one on Section 292, and the rider providing no more than 640 acres should be held by each well, that these two wells could be considered only as perfecting the lease on those two sections, and would not have any effect as to the remaining two and three-fourths sections. We affirm the judgment of the trial court as to Sections 4 and 282 and the south half (S/2) and the (NW/4)

of Section 284. The rider in question provided, "In the event that a gas well is drilled, the revenue from same shall be equal to, or exceed the amount of the annual rental payments, based on one well to each section." We are unable to place but one construction upon that provision, and that is that the revenue from the well on Section 292 was to be in at least the amount of $640 per year. Since the undisputed evidence shows that the revenue from the gas well on Section 292 had never been as much as $640 in any one year, it could not be considered as a gas well producing in paying quantities. If we were to consider that each well referred to more than 640 acres and only the two wells were drilled, and the primary term had expired, then the wells combined would not be in paying quantities as to keep the full lease in force because the net earnings from both wells as shown by appellants' own evidence did not amount to the $3,040 as provided in the rider to the lease. We overrule all assignments of error.

Judgment of the trial court is affirmed.