C. H. LEAVELL & COMPANY V. VILBIG BROTHERS, INCORPORATED.

No. A-7200. Decided April 20, 1960.
Rehearing Overruled May 18, 1960.
(335 S.W. 2d Series 211)

*Leachman, Gardere, Akin & Porter,* of Dallas, for petitioner.

*Wm. Andress, Jr.,* of Dallas, for respondent.

MR. JUSTICE WALKER delivered the opinion of the Court.

· The opinion delivered in this cause on February 10, 1960, is withdrawn, and the following is substituted therefor:

This is a controversy between a general contractor, C. H. Leavell & Co., and one of its subcontractors, Vilbig Bros., Inc. Leavell contracted with North Texas Municipal Water District for the erection of a water treatment plant and the construction of certain streets. Three phases of the street work were then sublet to Vilbig by separate contracts as follows: (1) Contract 169-B for grading and other earth work; (2) Contract 169-C for ready-mixed concrete; and (3) Contract 169-F for curb, gutters and paving. Contract 169-C is not involved in the case. Vilbig brought suit against Leavell to recover the retained percentages under Contracts 169-B and 169-F, and also compensation for extra rough grading alleged to have been done under Contract 169-F, damages for faulty engineering and fraud, and attorney's fees. Leavell admitted liability for the retained percentages subject to its asserted right to recover from Vilbig the cost of correcting a hump and subsidence in the paving laid by the latter and attorney's fees.

The case was tried to the court without a jury, and judgment was entered awarding Vilbig the retained percentages,

plus attorney's fees, less $2,458.38 allowed to Leavell for the cost of correcting the hump and subsidence. All other relief sought by either party was denied. Vilbig appealed, and the Court of Civil Appeals held that the trial court erred: (1) in allowing Leavell the cost of correcting the hump and subsidence; and (2) in failing to award Vilbig an additional $4,779.40 for the rough grading. The intermediate court reversed and rendered in Vilbig's favor with respect to these claims and otherwise affirmed the trial court's judgment. 319 S.W. 2d 731. Leavell is petitioner here with points of error attacking each of the holdings mentioned above.

There is no dispute as to many of the facts. Under the terms of Contract 169-B, Vilbig was required to bring the streets to within .2 foot of final grade. This work was approved as complete by Leavell's project manager on March 30,. 1956, and about two weeks later the contract price less a retainage of ten per cent was paid to Vilbig. Some eight or ten weeks then elapsed before Leavell called upon Vilbig to do the paving under Contract 169-F. In the meantime other subcontractors had installed pipes and utility lines under the streets previously graded by Vilbig.

Under the provisions of Contract 169-F, Leavell was to furnish the streets to Vilbig within .2 foot of final grade, and the later was to do only what is known as fine grading before starting actual paving operations. When Vilbig returned to begin work on this contract, it was discovered that additional rough grading was necessary because the streets were not within .2 foot of final grade at several places. Vilbig notified Leavell's project manager. D. J. Bandy, who instructed Vilbig to do the work necessary to prepare for the paving. In brining the streets to proper elevation, Vilbig did considerable grading which was not within the scope of Contract 169-F, and it billed Leavell for the cost of doing this as an extra under that contract. Leavell refused to pay, contending that Vilbig was obligated to do such work under Contract 169-B.

1 No detailed findings of fact or conclusions of law were filed by the trial court. Its judgment simply recites that Vilbig had failed to establish its claim for extra grading by a preponderance of the evidence. This phase of the case was reversed and rendered by the Court of Civil Appeals, apparently on the basis of its finding that "the evidence is sufficient to support appellant's claim for $4,779.40 for extra subgrading as alleged in its petition." Our appellate courts may not thus substitute their

findings for those of the trial court where the evidence will support either conclusion. The Courts of Civil Appeals have exclusive jurisdiction, of course, to determine whether the findings of the trial court or jury are against the overwhelming weight and preponderance of the evidence, but the sustaining of such a contention usually requires that the cause be remanded for another trial. In the ordinary case an appellate court cannot properly render judgment based on findings contrary to those made by the trial court unless the record shows as a matter of law that the latter are wrong. See Liedeker v. Grossman, 146 Texas 308, 206 S.W. 2d 232; Woodward v. Ortiz, 150 Texas 75, 237 S.W. 2d 286. No question of the weight and preponderance of the evidence has been raised by either party in the present case.

2   Vilbig obviously is not entitled to recover as an extra under the paving contract for doing that which at the time it was obligated to do under the grading contract. As indicated above, Bandy had certified the grading contract as complete and Leavell had paid the agreed price less a ten per cent retainage prior to the time Vilbig returned to do the paving. In response to a request for release of the retainage, Leavell had also advised Vilbig that the same would be paid upon final acceptance of the project and payment by the owner. Vilbig insists that in these circumstances the grading contract was a closed chapter, and that it is entitled to recover for any work thereafter done at Leavell's request which was not within the terms of the paving contract. This position would be sound if Leavell had waived, or was estopped from insisting upon, further performance under the grading contract.

3   Contract 169-B provides that acceptance of the work and making of final payment to the subcontractor would not relieve the latter of liability for defects in the work which were thereafter discovered. Bandy testified that Vilbig wanted to take its equipment to another job and asked for a release on the grading work; that he was unable to give such a release because only the owner's engineer could accept the work; that he did agree to the removal of Vilbig's equipment, but in the course of the conversation tried to make it clear that the latter had not completed the rough grading; that since the two contracts obligated Vilbig to take the streets down to final grade and pave them, he saw no objection to letting the subcontractor leave before all work on the grading contract had been done; that although he did not know it at the time, there was one place which Vilbig had not touched at all; and that he approved the grading contract as complete knowing that Leavell had a cushion

of the ten per cent retainage. In the light of this testimony and the contract provision, it is our opinion that the certification, payment and letter do not establish waiver or estoppel as a matter of law, and the trial court is presumed to have found in Leavell's favor on each of these issues.

Vilbig had the burden then of proving that the dirt work for which it sought extra compensation was not within the terms of the grading contract. See 17 C.J.S. Contracts, section 591. The testimony of its officers supports the conclusion that the streets were brought to within .2 foot of final grade before the heavy equipment was moved in March, and that excess dirt from the utility ditches was later spread thereon. Photographs taken at the time it returned show piles of dirt in the areas which were to be paved. There is also testimony that the streets were used by Leavell and its other subcontractors during the ten-week period, and that such use while the ground was wet caused the surface to become rutted and uneven. Without attempting to review the evidence in detail, we agree with the Court of Civil Appeals that the record will support a finding that Vilbig was required to do rough grading which was not within the terms of either of its contracts.

On the other hand, Bandy testified that none of the contractors or subcontractors spread excess dirt where Vilbig had graded, and that the piles of dirt shown in the pictures were removed by another subcontractor, Condon & Cunningham. He also stated that the place which Vilbig had not touched before returning to do the paving was 250 or 300 feet long and that the grade there had to be taken down about four feet. The evidence does not disclose how much of the work claimed as an extra was done in bringing this area to grade. Bandy recognized that there was some washing and rutting during the ten-week period, but the amount of rough grading necessitated thereby cannot be determined from the record.

The evidence is conflicting, and the trial court was entitled to conclude that most of the additional rough grading was occasioned by Vilbig's failure to bring the streets to within .2 foot of grade before leaving in March. Once that conclusion is reached, there is nothing to show how much of the alleged extra work was made necessary by grade disturbances occurring after the initial grading was done. With the record in this condition, it cannot be said that the denial of any recovery on the claim was erroneous as a matter of law.

The necessary engineering work in connection with Contract 169-B was to be done by Leavell. According to the evidence, this involved the setting of slope stakes at 50-foot intervals outside the curb lines. After these stakes were set by Leavell's engineer, Montoya, Vilbig placed grade stakes in the curb lines and elsewhere in the streets. To set the grade stakes properly it was necessary to read the slope stakes and then measure out and up or down to stablish the grade of the street. The transferring of grade from slope stakes to grade stakes is not regarded as engineering, but is referred to in the trade as "guinea chasing."

In addition to its claim for extra rough grading, Vilbig sought to recover damages for delay and expense alleged to have been caused by Montoya's mistakes in setting his stakes. The two claims are entirely separate, and the trial court also denied any relief on the latter count. Vilbig did not attack this holding in the Court of Civil Appeals, and makes no contention that the extra rough grading was caused by faulty engineering.

After the paving was done, part of the fill placed by Vilbig settled, and this caused the pavement to crack and disintegrate. At another place a hump was found in the pavement. Upon being requested by the owner's engineers to correct same, Leavell called upon Vilbig to do so. Vilbig refused, and Leavell had to the work done by another contractor. The Court of Civil Appeals held that the action of the trial court in allowing Leavell's claim against Vilbig for these items of expense was erroneous.

Vilbig guaranteed its work under the paving contract for one year against defects in workmanship or material. An issue of fact is raised by the evidence as to whether the hump was caused by an error on Montoya's part in placing the slope stakes or by Vilbig's mistakes in setting the stakes which held its forms. Since the trial court evidently decided that the hump was caused by Vilbig's faulty workmanship and the record supports this conclusion, the allowance to Leavell of $381.69 for correcting same should not be disturbed.

4. There is, however, no evidence to show that the subsidence in the paving was due to any defect in Vilbig's workmanship or materials. On the contrary, Bandy testified that the grade was in accordance with the plans, that the materials used were satisfactory, that the fill was compacted to the proper density, and that the work was accepted by the engineers. He could think

of nothing Vilbig had done or failed to do which was not in accordance with the plans and specifications, and expressed the opinion that the subsidence was caused by a downspout which introduced water into the area after the paving was done. Since Vilbig had completed its contract in accordance with the plans and specifications, it is not responsible for subsequent damage to the paving resulting from no fault on its part. See Lonergan v. San Antonio Loan & Trust Co., 101 Texas 63, 104 S.W. 1061; 9 Am. Jur. Building and Construction Contracts, section 27. Leavell should not, therefore, have been allowed the cost of correcting the subsidence.

The judgments of the courts below are reversed, and the cause is remanded to the trial court with instructions to enter judgment in Vilbig's favor for $9,792.95, the same being the retained percentages plus the $500.00 attorney's fee previously awarded by the trial court less the $381.69 credit to which Leavell is entitled for correcting the hump, with interest and costs of suit in the trial court as provided in the original judgment, and denying all other relief sought by either party. Vilbig will pay the costs in the Supreme Court, and all other costs of appeal are adjudged against Leavell.

Opinion delivered April 20, 1960.

MR. JUSTICE SMITH, dissenting.

The dissenting opinion delivered in this cause on February 10, 1960, is withdrawn, and the following is substituted therefor:

This dissent is written because the writer is not in agreement with the holding of the Court that no evidence was introduced supporting the trial court's finding and judgment that Vilbig was indebted to Leavell in the sum of $2,076.69 for the expense incurred by Leavell in having the Kan-Tex Company repair the subsidence in the paving laid by Vilbig.

The Court of Civil Appeals substituted its findings for the findings of the trial court, and this Court has erroneously approved such action.

Leavell's pleadings relating to this question are to be found under paragraph XII of its amended answer. The pleadings refer to the hump or bump and the subsidence, and reads as follows:

"That by reason of defective materials and/or workmanship, plaintiff left a hump or bump on the road it paved near the entrance road to the chemical building, and on or about November 21, 1956, by letter bearing said date, defendant requested plaintiff to correct same, which plaintiff refused to do, and defendant had same corrected at an expense of $381.69. That by reason of defective materials and/or workmanship, the road built up and paved by plaintiff under said contracts Nos. 169-B and 169-F sank due to settlement of the railroad spur fill and road fill, both of which were placed by plaintiff near Station 11+00 on the railroad spur, and on or about May 28, 1957, defendant in writing requested plaintiff to amend and make good such defect, which plaintiff refused to do, and defendant had same done and it was completed by Kan-Tex Company at the expense of plaintiff on or about August 27, 1957, at a reasonable and necessary cost of $2,076.69. Sec. 20 of said contracts provides that the subcontractor shall promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of the owner and/or architect or their authorized representatives and should the subcontractor refuse or neglect to proceed at once with correction of rejected or defective materials and/or workmanship after receiving notice to do so, it was agreed that the contractor should have the right and power to have the defects remedied or changes made at the expense of the subcontractor, and the subcontractor agreed to pay contractor on demand any and all loss and/or expense paid or incurred by the contractor in remedying such defects and/or making such changes, together with interest thereon at the rate of 6% per annum until paid. It further provided in Sec. 21 of said contracts that the obligation of the subcontractor to perform and complete all work covered by said subcontracts to the satisfaction of the contractor and the owner is absolute and without exception. Sec. 35 of said contract provides that in the event of a breach of this contract or any of its provisions by the subcontractor resulting in litigation by the contractor to enforce its rights, the subcontractor agrees to pay the contractor a reasonable fee for its attorney's services, which fee may be recovered in the same suit as part of the contractor's cause of action. By reason of such provisions, plaintiff has become indebted to defendant in the sum of $381.69, the further sum of $2,076.69, together with interest on said sums at the rate of 6% per annum from the date same became due, and reasonable attorney's fees for the services of defendant's attorneys herein, which sum should be deducted from the retainages heretofore tendered to plaintiff."

Vilbig in answer to Leavell's pleadings in regard to the subsidence pleaded in paragraph VI of its first supplemental petition:

"Plaintiff denies that the road built up and paved by plaintiff near station 11+00 on the railroad spur sank due to settlement of the railroad spur fill and the road fill as prepared by plaintiff, and says that after the plaintiff had completed the fill, defendant by its own employees cut the fill with a ditch across it and laid the lines the defendant desired and then back-filled the ditch without compacting it to the density required by the specifications, and thereupon ordered plaintiff to pave across it, and the settlement which occurred after the spring rains occurred in the area where the plaintiff had not done the construction work but where it had been done by the defendant, and was due to the failure of the defendant's employees to properly compact the back-fill. At all times plaintiff was required to conform to the specifications before authorization was given to it to pave, and there have been no defects where plaintiff was in charge of the work."

The trial court's judgment as to the subsidence item of $2,076.69, which was allowed Leavell as a credit reads as follows: "Plaintiff [Vilbig] is indebted to defendant [Leavell] in * * * in the sum of $2,076.69 for the expense incurred by defendant in having Kan-Tex Company repair the subsidence in the paving laid by plaintiff * * *."

It is uncontroverted that the reasonable cost of correcting the sag or subsidence was $2,076.69, and that it cost Leavell that amount of money to get the work done after respondent failed or refused to make good its *guarantee* or *obligation*. The contracts involved provided that petitioner could have the work done at the expense of the respondent. The evidence supporting the trial court's findings disproves respondent's only defense. That defense was that some independent agency was responsible for the subsidence. The specifications prepared under the terms of the contracts provided that Vilbig had to guarantee the paving for one year. Mr. Charles Vilbig, President of Vilbig Company, testified that he was familiar with the terms of the contract and that Vilbig was to complete all work and to promptly amend and make good any defective material and workmanship all to the entire approval and acceptance of the owner. Vilbig's only chance of escape of liability was to plead and establish to the satisfaction of the trial court in accordance with rules of evidence and to establish by the preponderance of the evidence

that the subsidence was not due to defective material furnished or poor workmanship on the part of Vilbig. The evidence shows that Vilbig is liable under the express terms of Section 2, 20, and 21 of Subcontracts 169-F and 169-B. See Footnote 1 for said Sections. Vilbig's testimony that the subsidence was caused by the cutting of a ditch across the embankment for the laying of a pipe line was rejected by the trial court. The trial court accepted Leavell's evidence. One of the witnesses for Leavell, a Mr. J. C. Bandy testified that he was familiar with the situation where petitioner had sued for $2,076.69 for repairing the place where the subsidence occurred. Petitioner's brief reflects and I herewith adopt the statement that Mr. Bandy testified that the repair was made at "the extreme northwest corner of the chemical building, between the chemical building and the railroad track and under the railroad track; that there were not any pipelines or ditches that crossed the road at that place, and as to what occurred there that made the repair necessary, as to what defect showed up, it was a settlement in a railroad fill placed by Vilbig and that caused the pavement to settle and crack, disintegrate, and Forrest & Cotten requested that it be corrected, but petitioner's attitude would be that it would want to fix it anyhow without demand as they wanted a to do a good job; that by letter to Mr. Vilbig and Mr. Andress, petitioner requested Vilbig to do it but Vilbig did not do it but had someone else to do it, to correct that defect, he hired Kan-Tex Company which also corrected some other defects which petitioner considered its own and petitioner got a separate statement on the part where the fill settled and the pavement cracked as he asked Kan-Tex to bill them for each place separately so they would know what was their share and what was Vilbig's share, and he got a separate bill from Kan-Tex for that, and defendant's Exhibit No. 23 is the statement which includes only the part where the fill sank up by the railroad embankment, and

---

1.—"Section 2. * * * In addition, the work covered * * * shall be sataisfactory to and meet the approval of the engineer having jurisdiction and the general contractor * * * ."

"Sec. 20. The subcontractor shall promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of the owner and/or architect or their authorized representatives. Should the subcontractor refuse or neglect to proceed at once with correction of the rejected or defective materials and/or workmanship after receiving notice to do so, it is agreed that the contractor shall have the right and power to have the defects remedied and changes made at the expense of the subcontractor, and the subcontractor agrees to pay to the contractor on demand any and all loss and/or expense paid or incurred by the contractor in remedying such defects and/or making such changes, together with interest thereon at the rate of 6% per annum until paid.

"Sec. 21. The obligation of the subcontractor to perform and complete all work covered by this subcontract to the satisfaction of the contractor and owner is absolute and without exception; * * *."

Exhibit D-23 was admitted in evidence, and as to whether or not Kan-Tex Company did the work that is set out in said Exhibit and furnished the equipment and material and labor that are set out on said Exhibit, he was out there at the time this work was going on and he invited Mr. Andress or Mr. Vilbig or someone to come out and verify the work and verify the quantities of material used, but he heard nothing from them although he told them when the work was going to be done and who was going to do it and how it was going to be done; that these charges for that kind of work and for the material and the use of their equipment and labor, and for moving in and out and for the overhead charge and profit, and Kan-Tex actually charged petitioner for the work Kan-Tex did in repairing that fill that settled and sank the sum of $2076.69."

Mr. Bandy, on cross-examination about the area where there was a subsidence that was due to the settlement of the railroad fill, testified that "the paving went down and cracked and disintegrated; that the area where this subsidence occurred was not in the area of the excavation for the building; that respondent did the railroad back-fill, the railroad embankment and the railroad embankment was put there in place under contract 169-B; that petitioner did not have any written notification of any kind from Forrest & Cotten with reference to the subsidence and didn't need any, but Forrest & Cotten called him two or three times on long distance phone, wanting to know when petitioner would get out there and do that; that Kan-Tex by way of corrective work drilled holes through the surface of the pavement and put a soil cement type of material, pumped it under the pavement through these holes under pressure, and raised the pavement back up to the grade."

In accordance with thes terms of the contracts, supra, the owner's architect and engineer required that the sag or subsidence be corrected. The defects appeared within the one-yar priod of Vilbig's guarantee. Leavell's testimony that no ditch was cut across the fill or embankment and that the failure of the fill or embankment to be completed to the required density was due to defective workmanship on the part of Vilbig was accepted by the trial court. The evidence shows that the settlement or subsidence caused the pavement to settle and crack. It was further shown that Vilbig so compacted the fill as to permit more than the maximum amount of water to infiltrate into it (the fill) than that required to get maximum density and therefore the fill settled and the pavement cracked. The trial court having resolved the issue made by the evidence, such findings are binding on the Court of Civil Appeals. That court had

no right to substitute its own findings for the findings of the trial court.

The elementary principles of law that must be applied here in determining whether the findings of the trial court, sitting without a jury, should be sustained are clearly set forth in the case of Wisdom v. Widener, Texas Civ. App., 309 S.W. 2d 496, reversed on other grounds, Wisdom v. Widener, 159 Texas 98, 316 S.W. 2d 148. The rule is no different than the rule applied in a jury case. See Benoit v. Wilson, 150 Texas 273, 239 S.W. 2d 792. In either case, the trier of the facts has the right to reconcile conflicting testimony, if possible, or to accept as true or reject all, any part or none of the testimony of any witness. The trier of the facts may accept the theory presented by either party and reject the theory persented by the adverse party if he thinks the evidence justifies such action. The trial court in the present case incorporated in its judgment a finding on this question in favor of Leavell. To test the sufficiency of the evidence to determine if it will support such findings and judgment, we must give credence only to the evidence and circumstances favorable to the findings and judgment and disregard all evidence to the contrary, indulging every legitimate conclusion which tends to uphold such findings and judgment. This proposition needs no authority, but see such cases as Benoit v. Wilson, supra; Wisdom v. Widener, supra; Wininger v. Ft. Worth & D. C. Ry. Co.. 105 Texas 56, 143 S.W. 1150; Banks v. Collins. 152 Texas 265, 257 S.W. 2d 97; Hill v. Foster, 143 Texas 482, 186 S.W. 2d 343.

The case was fully develoned, and the issues were clearly drawn. Since the controlling fact issues were resolved against Vilbig in the trial court, the judgment of the Court of Civil Appeals should be reversed and that of the trial court affirmed.

Opinion delivered April 20, 1960.

### ON MOTION FOR REHEARING

MR. JUSTICE WALKER delivered the opinion of the Court.

In its motion for rehearing Leavell states that after the trial court's original judgment was rendered, it paid Vilbig $7,716.26 on the judgment with the agreement that the right of either party to appeal would not be prejudiced thereby. Such motion for rehearing is granted to the extent that the trial court is directed, in addition to the instructions set out in our opinion

of April 20, 1960, to allow proper credit for any amounts paid by Leavell to Vilbig on said judgment after the same was rendered. In all other respects the motion for rehearing of each party is overruled.

Rehearing overruled in part May 18, 1960.