SKELLY OIL COMPANY, Petitioner

V.

GERTRUDE L. ARCHER ET AL, Respondents

No. A-7884. Decided November 29, 1961
On Rehearing February 21, 1962
356 S.W. 2d 774

HAMILTON and SMITH, ASSOCIATE JUSTICES, dissenting.

*C. L. Swim,* Tulsa, Okla., *Underwood, Wilson, Sutton, Heare & Berry,* Amarillo, for petitioner.

*Sanders, Scott, Saunders, Brian & Humphrey,* Amarillo, for respondent.

JUSTICE GRIFFIN delivered the opinion of the Court.

This action was brought by Mrs. Gertrude Archer et al against Skelly Oil Company in trespass to try title and, in the alternative, for termination of an oil and gas lease on four and three-fourths sections of land upon which the primary term had ended. The lease was entered into between Mrs. Archer as lessor and Skelly Oil Company as lessee, on August 5, 1943, for a primary term of ten years, and the property described in the lease was in Hansford County, Texas, and covered all of Sections 4, 282, 285 and 292, and the S/2 and NW/4 of Section 284, except 1/2 of the minerals in the SE/4 of Section 284 never owned by the lessor, totaling 3,040 acres more or less. The parties named as plaintiffs below, other than Mrs. Gertrude Archer, acquired their interest by conveyance from Mrs. Archer after the original oil and gas lease was executed.

This is the second appeal of the case. On the first trial motion for summary judgment by Skelly Oil Company was sustained, the effect of which was a holding by the trial court that the lease was valid and in force as to the entire 3,040 acres covered thereby. On appeal from that judgment the case was reversed and remanded for trial on the merits as to the effect of the provisions of the rider attached to the lease contract and with regard to whether the two gas wells situated on the leased acreage were producing in paying quantities. The Court of Civil Appeals'

opinion on the former appeal is reported in 314 S.W. 2d, at page 655. Application for writ of error to this court was refused, no reversible error, with per curiam opinion reported in 317 S.W. 2d 47.

The oil and gas lease in issue was entered into on a form commonly used in Texas and contained a habendum clause as follows:

"It is agreed that this lease shall remain in force for a term of ten years from date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

Subsequent to the habendum clause is the usual clause providing for payment of 1/8 of production, and following' the royalty provision is the annual rental provision providing for the payment of $3,040.00 annual delay rental. Attached to the lease contract, directly over the above-mentioned annual rental payment clause, is a typewritten rider as follows:

"In the event of gas production being obtained on the above 3,040 acre lease, not more than 640 acres shall be held by each well, and annual rentals shall be paid on the balance of the acreage. In the event that a gas well is drilled, the revenue from same shall be equal to, or exceed the amount of the annual rental payments, based on one well to each Section. In no event shall the payments received by the lessor amount to less than $3,040.00 during any 12 months period. This rider and provision shall be controlling over any conflicting provisions contained in the printed form attached hereto and made a part hereof."

Trial of the action now before this court was to a jury in the District Court of Hansford County, Texas. At the close of the evidence the court held:

"* * * as a matter of law *and also by uncontroverted facts as shown by the evidence and the testimony* and the Court now finds and holds that the oil and gas lease in question dated August 5, 1943, has terminated as to Section 4, Block 'P' H&GN RR Co. Survey; all of Section 282, Block 2, GH&H RR Co. Survey; and the South half (S/2) and the Northwest Quarter (NW/4) of Section 284, Block 2, GH&H RR Co. Survey, all in Hansford County, Texas, same having terminated at the expiration of the primary term of said lease, to-wit: August 5, 1953, and further, that said oil and gas lease which

is recorded in Volume 9, page 286, Lease and Contract Records of Hansford County, Texas, is a valid and subsisting lease covering Section 285, Block 2, GH&H RR Co. Survey, Hansford County, Texas, same being continued after the primary term of said lease down to the date of trial by virtue of production of gas in paying quantities from said Section 285." (Emphasis added.)

The above holding left only Section 292 for consideration in the trial. One special issue was submitted to the jury, and this issue inquired if the gas well on Section 292 had failed to produce gas in paying quantities for the three-year period subsequent to the primary term, August 5, 1953, to August 5, 1956, the evidence having been limited by the court to this period. The jury answered that the well had failed to produce in paying quantities. On the basis of the holding by the trial court and the jury verdict, judgment was entered that respondents have title and possession of Section 4, 282, 292 and the South half (S/2) and the Northwest quarter (NW/4) of Section 284, and that the lease was to continue in full force and effect as to Section 285. Upon appeal by Skelly the trial court's judgment was affirmed. 334 S.W. 2d 855.

There has been no oil discovered or produced on any of the land covered by Skelly's lease. Prior to the expiration of the primary term of the lease a gas well was brought in on Section 285 and another well on Section 292, and both wells were producing gas at the time of the trial.

No complaint is made in this court of the judgment of the trial court and Court of Civil Appeals' holding that Skelly's lease is in full force and effect as to Section 285, Block 2, Hansford County, Texas. Therefore, that judgment is here affirmed.

Petitioner Skelly Oil Company seeks to have the lease declared valid and subsisting in its entirety as to all of the four and three-fourths sections described therein.

On the first appeal of this case, and being an appeal by the Archers from the trial court's action in favor of Skelly, the Court of Civil Appeals said that to uphold the summary judgment it must be held as a matter of law that the oil and gas lease, with the rider attached, extended the lease beyond the primary term on all the land described in the lease by virtue of production of gas on Sections 285 and 292 during the primary term. Skelly makes the same contention on this appeal. As to this point, the

Court of Civil Appeals on the first appeal reversed and remanded the summary judgment thus overruling the above contention. 314 S.W. 2d 655, 317 S.W. 2d 47, wr. ref. n.r.e.

The only significance of our refusal of writ of error, "no reversible error", on the former appeal, in so far as the construction of the lease is concerned, was to approve the judgment of the Court of Civil Appeals and necessarily, therefore, to reject Skelly's contention that, as a matter of law, production in paying quantities from a single well would extend the life of the entire lease beyond the primary term. Our action did not have the effect of approving the construction placed on the lease by the Court of Civil Appeals.

On retrial of the case—from which this is an appeal—Mrs. Archer pleaded, alternatively, that if the lease with rider attached was ambiguous, all parties intended by attachment of the rider to modify the provisions of the lease so that after the expiration of the primary term each well producing in paying quantities would hold only 640 acres; that is, that as to all sections on which there was not a well producing in paying quantities the lease would terminate. Testimony was offered by the Archers in support of this pleading. At the conclusion of the testimony the Archers filed a motion for an instructed verdict, in the first two paragraphs of which it moved the court to find, as a matter of law, that their construction of the lease was a correct one. The court granted Paragraphs 1 and 2 of such motion, and it was pursuant to that action that the court included in its judgment the finding, hereinabove quoted, "as a matter of law *and also by uncontroverted facts as shown by the evidence and the testimony*". (Emphasis added.)

■ We have concluded that the attachment of the rider makes the lease ambiguous. Not only is its meaning uncertain and doubtful, thus meeting the test of ambiguity announced in Neece v. A.A.A. Realty Company, 159 Texas 403, 322 S.W. 2d 597, our latest decision on the subject, but it is also subject to more than one reasonable meaning, unresolvable by rules of interpretation, thus meeting the stricter test of ambiguity laid down in Universal C.I.T. Credit Corp. v. Daniel, 150 Texas 513, 243 S.W. 2d 154. The primary object of courts in construing written contracts is to arrive at the intention of the parties. The provisions of the rider may be interpreted as modifying the rights and obligation of the parties only during the primary term of the lease. This is the interpretation for which Skelly contends. They may be interpreted as modifiying the rights and obligations

of the parties throughout the life of the lease. This is the interpretation for which the Archers contend. But if they are interpreted as modifying the rights and obligations of the parties throughout the life of the lease, they may be further interpreted as meaning that after the primary term the entire lease could be kept alive by production from a single well plus the payment of a sufficient sum to equal $3,040.00 annually. This is the construction originally given by Skelly as is shown by Skelly's annually tendering checks to the amount of $3,040.00. Any one of these interpretations would be equally reasonable, or unreasonable, as the case may be, and the proper construction therefore becomes a fact question.

■ The burden was on the Archers, as plaintiffs, to prove their case. They could prove it in either of two ways: by securing a holding that the lease was unambiguous and could be given only the construction for which they contend, or, if the lease were ambiguous, by introducing evidence that the parties intended it to have the construction which they gave it. Neece v. A.A.A. Realty Co., 159 Texas 403, 322 S.W. 2d 597, 599, 603. While contending that the lease was unambiguous, the Archers nevertheless introduced evidence bearing on the intention of the parties. If the evidence on this issue was conflicting, the Archers also should have secured submission of an issue to the jury. This they did not do. Instead, in response to their motion, the trial court found, "as a matter of law and also by uncontroverted facts as shown by the evidence and the testimony", that the parties intended the lease to have the meaning attributed to it by the Archers. Skelly's theory of the case has been—and is— that the lease with the rider attached is unambiguous. In none of its pleadings filed in the trial court, nor in any of its briefs in the Court of Civil Appeals or this Court, has Skelly asserted that there is any ambiguity in the lease contract with the rider attached. Neither has it challenged on appeal the correctness of the action of the trial court in deciding questions growing out of an ambiguous situation in favor of the Archers as a matter of law rather than submitting the same to the jury. Skelly by Points 4 and 7 in its briefs in the Court of Civil Appeals contended that the uncontroverted evidence and the terms and provisions of the lease showed that the lease had not terminated as to any of the land. This contention is consistent with Skelly's theory of the case that the lease is unambiguous. We do not agree with this contention. Skelly does not in this Court seek to change the theory on which it tried this case. It must stand upon its contention that, as a matter of law, the rider did not modify the habendum clause of the lease and that, therefore,

production in paying quantities from a single well would, as a matter of law, keep the entire lease alive after the expiration of the primary term. We rejected this construction of the lease on the first appeal by denying Skelly's application for writ of error, and we reject it now.

To sustain its position that the lease had not terminated on any of the land described therein, Skelly placed principal reliance upon the cases of Waggoner Estate v. Sigler Oil Co., 1929, 118 Texas 509, 19 S.W. 2d 27; Henshaw v. Texas Natural Resources Foundation, 1949, 147 Texas 436, 216 S.W. 2d 566; Lido Oil Co. v. W. T. Waggoner Estate, 1930, Texas Civ. App., 31 S.W. 2d 154, wr. ref.; Johnson v. Montgomery, 1930, Texas Civ. App., 31 S.W. 2d 160, wr. ref.; and Glasscock v. Sinclair Prairie Oil Company, 185 F. 2d 910, U.S.C.A. (5th Cir., 1950), and a Texas case.

None of these cases are in point nor controlling in the case at bar. The two Waggoner cases are the same case but different appeals. The wording of the lease there involved was different from our lease and rider. There was no rider attached to the lease in either of the Waggoner cases. In those cases cancellation of the lease was sought on the basis that the lessee Oil Company had failed to properly develop the leased premises and, therefore, the leases had expired.

The Henshaw case, 147 Texas 436, 216 S.W. 2d 566, bears not the slightest resemblance to our case, either as to facts or the legal principles involved. It was a suit between joint venturers in which one sought to forfeit and cancel the interest of the other in the common property.

In Johnson v. Montgomery, 1930, Texas Civ. App., 31 S.W. 2d 160, wr. ref., the parties to an oil and gas lease provided for a primary term of five years and the lease to last as long thereafter as oil or gas, or either of them, was produced from said land. Only two gas wells were completed on the land during the primary term. Under the terms of a contract contemporaneously executed by the lessors and lessee in the oil and gas lease (and which contract by reference made the lease a part of the contract) when lessee commenced a test well on any section he had the right to select three (3) other sections to be freed from paying delay rentals. The lessee had selected three additional sections for each well. At the end of the primary term, lessors brought suit to cancel and forfeit the lease as to all the 22,485 acres covered by the original lease, except the eight sections

in the two blocks with the two gas wells. Among other contentions lessors claimed that by virtue of freeing the eight sections under the lease from delay rentals under the contract, the habendum clause of the lease had been changed so that it held only such eight sections and terminated as to the balance. As to this contention the court held the contract covered only the delay rentals due under the primary term and did not affect the duration of the estate beyond the primary term. Such holding was correct under the contract there involved. There can be no question that the contract involved in that case made no attempt to change or modify the habendum clause of the lease, but applied only to the delay rentals which were payable only during the primary term. No language is used—as is found in our case —that one gas well should hold not more than 640 acres out of the total acreage covered by the lease.

In the case of Glasscock v. Sinclair Prairie Oil Co., 185 F. 2d 910 (5th Cir., 1950), the lease contained a provision that drilling or reworking operations, or production from any well on the land should continue the lease in force only in so far as the lease covers the tract in which the well was located, and not to exceed 640 acres to be selected by lessee. It then proceeds, "The aforementioned rental payable by Lessee" to cover deferment of drilling operations for twelve months each "* * * during the primary term shall be reduced by One Dollar ($1.00) per acre for each acre of land included within any tract or tracts which Lessee is holding or entitled to hold on the due date of the rental payment in question * * *." The court held that the provisions of the paragraph from which we have quoted applied only to the delay rentals payable during the primary term. The court further said these provisions were to insure the lessor a continuation of the rental payments instead of a cessation of such payments in the event of drilling or production under the lease. It was pointed out that without this provision the drilling, reworking operations or production from one well would have caused a cessation in payment of the entire delay rentals during the primary term. To avoid this the provisions insured the lessor a continuation of delay rental payments with only a credit of $1.00 per acre per unit of 640 acres on which there was located a well. Under the language of the instrument under consideration in the Glasscock case, it is very plain that only the primary term was involved.

This holding makes it unnecessary to discuss any of Skelly's points of error in the application, except those complaining of the court's charge and instructions in connection with the one

issue submitted inquiring if the gas well on Section 292, Block 2, had failed to produce in paying quantities from the end of the primary term, August 5, 1953 to August 5, 1956.

■ Skelly assigns error to paragraphs four and five of the general instructions contained in the court's charge to the jury. Paragraph 4 is as follows:

"The words, 'paying quantities', as used in this charge and as applied to a gas lease, mean that the gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well."

Paragraph 4 is a correct statement of the law as applied to the case before us where it is sought to keep the lease alive beyond the primary term by production from the well or wells on the leased land. In our case that land is Sec. 292, containing 640 acres. Summers: Oil and Gas, Permanent Ed. Vol. 2, Sec. 306, p. 330. 13 Oil and Gas Reporter 516; Garcia v. King, 1942, 139 Texas 578, 164 S.W. 2d 509; Clifton v. Koontz, 1959, 160 Texas 82, 325 S.W. 2d 684, Sec. 7. We hold there was no error in the court's defining "paying quantities" as it did.

Paragraph 5 is as follows:

"In determining 'operating and marketing expenses', as that term is used in this charge, if any there be, you may consider such expenses as taxes, overhead charges, labor, repairs, depreciation on salvable equipment, if any, and other such items of expense, if any. In this connection, you are instructed not to consider any costs or expenses in connection with the original drilling of the well."

Skelly's objections to this paragraph are that it permitted the jury to take into consideration "depreciation on salvable equipment". Skelly also objects that overhead charges are not proper items to be taken into consideration in determining whether or not a well is producing in paying quantities.

In Clifton v. Koontz, 1959, 160 Texas 82, 325 S.W. 2d 684, we were not called upon to pass on the question whether or not depreciation on producing equipment, which is salvable, should be charged.

An address entitled "Production in Paying Quantities: Tech-

nical Problems Involved", delivered by Mr. Edwin M. Cage to the Tenth Annual Institute on Oil and Gas Law and Taxation, p. 61, 90 et seq., discusses these two items. He says with regard to depreciation:

"All this points up the one inescapable conclusion that the bookkeeping entry of depreciation is in no sense an 'out-of-pocket' lifting expense and it should *never* be included as an item to be deducted from revenue to determine whether a lease is still producing in paying quantities. There is a possibility, however, that the lessor in a carefully prepared case could establish 'actual depreciation' (as distinguished from the bookkeeping entry) as a legitimate charge to lifting expense. For example, in pumping a well the lessee may be using some equipment which has been 'written off' completely and on which lessee is no longer taking any depreciation. Still that piece of equipment may have a current salvage value. To some extent continued operations are wearing out that equipment and reducing its salvage value. The proof may be difficult and the reduction in value may be slight, but the fact remains that there is 'physical depreciation' which is properly chargeable to lifting expense.

"But you say, 'This is not out-of-pocket money.' Perhaps not, in the literal sense, but it is certainly an out-of-pocket asset in the same sense as if a lessee supplied his fuel and grease from a warehouse stockpile rather than from current cash purchases. In either situation the consumption of the asset can only be attributed to the lifting expense of the well."

While our well has no pumping equipment, it does contain certain items of salvable equipment necessary to produce the gas from the well—and not a part of the drilling and completion expense—the life of which is being used up in producing the gas sold from the well. This equipment should be depreciated if the evidence shows it is subject to depreciation as a part of the expense in producing and marketing the gas.

As to the overhead charges, Mr. Cage in his address concludes that they are more difficult for the lessee to explain than depreciation. He concludes that those items of overhead charges which can be traceable to the actual expense of production of the well's product for marketing should be considered in determining whether or not the well is producing in paying quantities. Whitaker v. Texaco, Inc., 283 F. ed, 169, Secs. 9-10, (10th Cir., 1960).

In the case at bar Skelly's witnesses testified that in arriving at the figure of net profit from the well on Section 292, there were no charges of minor repairs, depreciation of salvable equipment, well inspections, and other items of expenses for this particular well. The witnesses said these items would ordinarily be performed by the local people in charge of the operations and would not show up on the vouchers submitted to their offices for recording. One witness testified that although it took labor for conditioning the well, repairs and supplies, etc., there was no evidence of any allocation of these items in figuring the net profit as shown on the exhibits relied upon to show a profit in operation.

■ Skelly complains that the court's charge permits the jury to consider taxes, labor and repairs, "and other such items of expense, if any", in determining whether or not the well was producing in paying quantities. The labor, repairs, and taxes (in this case only gross production taxes and ad valorem taxes were inquired about or testified to) which were allocated to this well and which were used on this well in order to properly produce the well or keep it producing, are proper items of expense to be considered. We find no error in the "other such items of expense", and do not believe that this phrase led the jury into error.

According to the testimony of Skelly's accounting witness, 7/8ths of the production from this well made the following net profits:

| August 1953-August 1954 | $ 48.04 |
| August 1954-August 1955 | 88.15 |
| August 1955-August 1956 | 183.24 |

The only expenses charged against Skelly's 7/8ths production were ad valorem taxes, gross production taxes, and district expenses. This last item was an allocation on a per well basis of the district administrative and supervisory expenses for supervising all of the wells in this district. As said above, Skelly's witness admitted that other expenses would be incurred for this particular well, and that such expenses had not been considered in determining whether or not this well had made a net profit for the company.

"These conflicting theories and methods of calculation were before the jury. The question of whether or not an oil well is producing in paying quantities is a question of fact for the

jury. Woodson Oil Company v. Pruett, Texas Civ. App., 281 S.W. 2d 159; Bain v. Strance, Texas Civ. App., 256 S.W. 2d 208; Clark v. Holchak, 152 Texas 26, 254 S.W. 2d 101; Garcia v. King, 139 Texas 578, 146 S.W. 2d 509." Sullivan and Garnett v. James, 1957, 308 S.W. 2d 891, at 893, n.r.e.

In view of the evidence in this case and the reasonable inferences a jury is permitted to draw, we cannot say there was no evidence to support the jury's finding that the well on Section 292 failed to produce gas in paying quantities during the period inquired about.

The judgments of the trial court and the Court of Civil Appeals are affirmed.

Opinion delivered November 29, 1961.

### ON MOTION FOR REHEARING

PER CURIAM.

On further consideration we have concluded that there is in the record no evidence of probative force to support the finding of the jury that the well on Section 292 is not producing in paying quantities.

The jury was instructed that in answering the issue it should determine whether Skelly was making a profit, though small, after deducting certain expenses, including cost of repairs and depreciation on salvable equipment. Gross income from the well over the three year period has been small indeed. There is evidence in the record of some repairs on well equipment. No doubt there is some salvable equipment which is depreciating. But there is in the record no evidence of the cost of the repairs; nor is there evidence of what equipment is salvable, the cost thereof, or a proper rate of depreciation. In short, there was no evidence introduced upon which the jury's answer to the issue can rest; it is founded upon speculation and surmise. At best the evidence is nothing more than a mere scintilla, and that is not enough to support the jury's answer to the issue or the judgment terminating the lease on Section 292. Joske v. Irvine, 91 Texas 574, 44 S.W. 1059.

The error affects only the part of the judgment terminating the lease on Section 292. There is no reason why that part of the judgment may not be severed and reversed and the remainder of the judgments of the courts below be affirmed. Rule 503, Texas Rules of Civil Procedure.

Having concluded to reverse the judgments in so far as they terminate the lease on Section 292, we come next to the question of whether judgment should be here rendered for Skelly because of the failure of the Archers to discharge their burden of proving that the well was not producing in paying quantities or whether in the interest of justice this phase of the case should be remanded to the trial court for retrial. Rule 505, Texas Rules of Civil Procedure. Considering the record before us as a whole, we have concluded that justice will be best served by a remand for retrial. Aetna Ins. Co. v. Klein, 160 Texas 61, 325 S.W. 2d 376; London Terrace v. McAlister, 142 Texas 608, 180 S.W. 2d 619.

This case was tried before our decision in Clifton v. Koontz, 160 Texas 608, 325 S.W. 2d 684. On retrial the burden will be on the Archers to prove that Skelly was not making a profit from operation of the well. If they fail to produce evidence which establishes that fact as a matter of law or fail to obtain a fact finding, supported by evidence, to that effect, the lease should not be terminated. If, on the other hand, the evidence establishes as a matter of law that Skelly was not making a profit from the well or if there is a fact finding, supported by evidence, to that effect, the lease should yet not be terminated unless the evidence establishes as a matter of law or the Archers obtain a fact finding, supported by evidence, that a reasonably prudent operator would not have continued to operate the well under the circumstances. In a jury trial this latter issue can be submitted conditionally.

The motion for rehearing is granted. The judgments of the trial court and Court of Civil Appeals cancelling the lease on Section 292 are reversed, that issue is severed and as to it the cause is remanded to the trial court for retrial. The judgment of the Court of Civil Appeals is otherwise affirmed.

Opinion delivered February 21, 1962.

JUSTICE HAMILTON, dissenting.

The dissenting opinion delivered on November 29, 1961, is withdrawn, and the following is substituted therefor:

I respectfully dissent from the Court's opinion.

It appears to the writer that the contract is unambiguous and should be construed by this Court. The rider, which deals with the subject of payment of rentals in case of discovery of gas, is in conflict with the rental-paying provision of the main

body of the lease, and no ambiguity arises when the rider is construed in connection with such provision. The question of ambiguity arises only when an attempt is made to lift a part of the first sentence in the rider, that is, "one well will hold only 640 acres" out of context and apply it to the habendum clause, the subject matter of which is wholly foreign to the subject matter of the rider.

It appears that where two possible constructions could be placed upon a contract, one of which would cause a conflict between two provisions and another would harmonize the two provisions, that the latter would be the reasonable construction and the other would not be reasonable. This rule of construction is supported by a decision of this Court in Universal C.I.T. Credit Corporation v. Daniel, 150 Texas 513, 243 S.W. 2d 154, cited by the majority opinion in support of its holding that the contract is ambiguous. The Court in that case, after stating that the primary concern of courts is to ascertain and give effect to the true intention of the parties, said:

"To achieve this object the courts will examine and consider the entire writing, seeking as best they can to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless."

It is clear from a reading of the rider that its subject matter is the payment of rentals, in case of gas production. No other subject is dealt with. The first three sentences therein deal with the matter of payment of rentals. The first two sentences simply modify the rental provision in the lease, so as to provide that in case of gas production, rentals are payable on all the acreage except the 640 acres per well, and even the 640 acres on which a gas well is drilled is not entirely exempt. If the royalty does not amount to as much as the annual rental on 640 acres, the difference is to be made up so that the revenue therefrom is not to be less than the rentals would have been for that acreage.

The third sentence simply says what is meant by the rider. That is, that payments under the lease, regardless of gas production, shall never be less than the rentals provided for in the lease ($3,040.00) during any twelve months' period. The lessor, for whose benefit this rider was placed on the lease, put her own interpretation on the rider by adding the third sentence to the first two sentences. It adds nothing to the contract except to make certain that the lease is not divisible. The Court of Civil

Appeals says it was added for emphasis. I think we should give effect to that emphasis.

The fourth sentence makes the rider provision controlling over conflicting provisions contained in the main body of the lease. Full effect is given to this sentence when the rider is construed as modifying the rental payment provision in the lease. No one contends that the rider is ambiguous as applied to the rental payment provision, and everyone admits that the rider and rental payment provisions are in conflict.

It should be held that since the rider refers only to the payment of rentals, it necessarily follows that it applies only to the primary term. Its purpose was to assure to the lessor during the primary term a continuance of the rental payments without any reduction in the total revenue received after production of gas was obtained. This construction is in accord with that given similar provisions by the courts of Texas and by the Fifth Circuit Court. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S.W. 2d 27; Lido Oil Company v. W. T. Waggoner Estate, 31 S.W. 2d 154, error refused; Johnson v. Montgomery, 31 S.W. 2d 160, writ refused; Glasscock v. Sinclair Oil Company, 185 Fed. 2d 910, 5th Cr. Ct.

The Waggoner Estate v. Sigler Oil Company case involved a lease which provided that one well would hold 2000 acres in a square around the well, and rentals were to be paid on the balance of the acreage. Suit was to cancel the lease on all acreage outside that held by each well. Only 3000 acres were involved, the rest of the 87,000 acres having been assigned to the Waggoner Estate. The suit was primarily for cancellation on account of nondevelopment. However, the primary term had expired. The court held that the lease was valid as to the acreage outside of the 2000 acres agreed to be held by one well. It did not discuss the matter which we have before us, but in the Lido v. Waggoner Estate case, which was the second appeal of the same case, the court, at page 159, 31 S.W. 2d, specifically construed the former opinion by the Supreme Court as holding that the proviso that one well would hold 2000 acres applied to the rental payment period only.

The Glasscock v. Sinclair Oil Company case, instead of saying that one well would hold only 640 acres, says that "production from any well thereon shall continue this lease in force *only* in so far as this lease covers a tract for each such well * * * containing not more than 640 acres", rentals to be paid on bal-

ance of the acreage. (Emphasis ours.) Each of these cases had a similar habendum clause and a similar rental payment provision to that contained in the Archer lease, and in each of the cases it was held there was no ambiguity and that the provision applied only to the rental payment provision and did not apply after the primary term.

Under the above authorities and the accepted rules of construction, I would hold the lease to be valid and binding as to the entire acreage covered thereby, since it is undisputed that there is paying production on Section 285.

ASSOCIATE JUSTICE SMITH joins in this dissent.

Opinion delivered April 4, 1962.

JUSTICE HAMILTON concurring on Motion for Rehearing.

While adhering to my dissent filed herein, I concur in the per curiam opinion of this court delivered February 21, 1962, holding that there was no evidence of probative force in the record to support the finding of the jury that the well on Section 292 is not producing in paying quantities. However, I would render judgment holding the lease valid as to Section 292 rather than remand the case for new trial as to this section only.

Since this case is being remanded as to Section 292 in the interest of justice, this court, in order to be consistent, should also remand the case as to Sections 4, 282, and the south half of the northwest quarter of Section 284 in the interest of justice. On the trial of the case the Archers went into the matter of the cost of repairs and depreciation, but failed to make proof of any such expenses of operation. They had as much opportunity to make such proof as they will ever have on another trial.

This court in its original opinion upheld the judgment of the trial court canceling the lease as to Section 4, 282, and the south half of the northwest quarter of Section 284 on the theory that the lease was ambiguous and that the trial court made an implied finding that the parties intended that a producing gas well would hold only one section after the end of the primary term. This court held that no attack was made on such finding of the trial court, and on this ground rendered judgment canceling the lease as to said sections.

It is evident why Skelly made no attack on such finding of

the trial court. The parties did not try this case on the theory on which this court decided the case. The Court of Civil Appeals did not decide the case on this theory. Neither of the parties briefed the case on this theory in the Court of Civil Appeals or in this court. It appears that this is one of the situations in which it was intended that Rule 505, Texas Rules of Civil Procedure, should be applicable. I would not sever the issue as to Section 292, but would remand the entire cause as to the four sections here involved to the trial court for retrial.

Opinion delivered April 4, 1962.